## FOSTER *v.* STATE.

### (*Nashville.* January 28, 1899.)

1. VERDICT. *Of murder in second degree not sustained by the facts.*

    The Court finds, upon the facts set out in the opinion, that a verdict for murder in the second degree is not sustained against a son for fatally shooting his father's assailant. (*Post, pp. 34–36.*)

2. EVIDENCE. *Of facts attending previous difficulty admissible in homicide cases.*

    On the trial of a son for killing his father's assailant, it is competent to prove, on behalf of the defendant, not only that defendant had seen a previous difficulty between his father and the deceased, but also the particular facts of the transaction—especially the menacing language and conduct of the deceased toward the father on the occasion. (*Post, pp. 36–38.*)

3. SELF-DEFENSE. *Son's right to defend his father.*

    If a son honestly believes, on reasonable grounds, that his father, who is himself fighting in self-defense, is in danger of death or great bodily harm, from an assault being made upon him by an antagonist of superior strength, it is his legal right, as well as his filial duty, to interfere and prevent the killing or maiming of his father, and he is, in such case, justified in the use of such means as are necessary, under all the circumstances, to effect this end. (*Post, p. 38.*)

4. SAME. *Evidence.*

    And, in such case, previous acts of hostility, and demonstrations, if any, made by the deceased toward the father, and coming to the knowledge of the son, are competent as tending to show whether the son had reasonable grounds to believe that the deceased was making a deadly assault upon the father. (*Post, p. 38.*)

---

### FROM GILES.

---

Appeal in error from Circuit Court of Giles County. E. D. PATTERSON, J.

J. T. ALLEN and F. RIVERS for Foster.

Attorney-general PICKLE and J. L. . COFFMAN for State.

WILKES, J.   A. T. and Morgan Foster are father and son.   The father is a man of about fifty-nine years of age; the son is a boy of sixteen. They were indicted for the killing of R. W. Woodard.   The father was acquitted.   The son was convicted of murder in the second degree and sentenced to ten years in the State penitentiary, and has appealed.

The deceased, Woodard, was a vigorous man about thirty-five years old, and estimated to weigh from 150 to 180 pounds.   Both Woodard and the elder Foster were wagoners and log haulers.   There had not been good feeling between them for some time. It appears that they, while driving their wagons and teams in opposite directions, met in the public road, when they, instead of passing, blocked each other in the way.   Some words ensued.   Both parties left their wagons and went back towards Marbuts, a post-office on the road near by.   In passing down the road the deceased came up to a lot of boys, white and black, who were having some music and dancing in the road.   It was Christmas times, December 27, 1897.   Among these boys, and taking part in the frolic, was Morgan Foster.   Deceased, on approaching the boys, pointed to the elder Foster, who was coming on behind him, and said, "Boys,

Foster *v*. State.

if you want to see a grand rascal, look up the road,'' pointing toward the elder Foster. The son heard the remark, and demanded to know of deceased what it was he said, to which the deceased replied: ''You are a minor, and I'll have nothing to do with you,'' and passed on.

The son, it appears, caught the purport of what the deceased had said but not the language. The son then started towards his father's wagon to help get it by the deceased when his father intercepted him and told him to let the team alone. In the meantime the deceased was returning along the road and met the elder Foster still on his way to Marbut's. He accosted Foster and said: ''Did you call me a son of a b—h at the wagon?'' to which the elder Foster replied, ''I did.''

Woodard then assaulted the father and had him to his knees and was choking or attempting to choke him, and was striking him over the head, whether with a knife or with his fists the son says he could not tell. The son ran up and demanded of Woodard that he desist and told him twice to hold up. Woodard persisted in the assault. It is shown that he was physically able to handle both of the Fosters. The elder Foster was not robust and was besides a cripple. The son, after calling to Woodard once, and according to some of the witnesses twice, drew a pistol and fired at deceased and shot him, the ball entering the eye and killing him. The boy then went up the road a short distance to his

father's home, at the suggestion of his father, and was soon afterward followed by two Deputy Sheriffs. When they entered the premises the boy ran out the back way and tried to make his escape to some bushes near by, when one of the officers shot him in the neck and head, putting out his right eye.

The deceased had the character of being somewhat quarrelsome and had had several fights. Upon this point, however, there is a conflict of testimony. The father testified that he was entirely powerless in the struggle with the deceased and believed he was in danger of losing his life; that he did not strike deceased, because the fierce assault gave him no opportunity; that he did not see his son or know that he was taking any part in the struggle until he heard the pistol shot and felt the deceased relax his hold upon him. The boy testified that he honestly believed his father was in danger of being killed or of receiving great bodily harm and shot in his defense, believing it to be necessary to save his father's life. The elder Foster was, upon these facts, acquitted of any offense. It is evident that if the son was guilty of any offense it was not of murder in the second degree, but of a much less offense, and the cause must be reversed and remanded for a new trial.

It appears that some time before this difficulty there had been another difficulty between the deceased and the elder Foster at Marbut's store. Deceased was at the store when Foster came up. The

Foster v. State.

latter was on horseback. He had been for some time going on crutches in consequence of a broken limb, but did not have his crutches with him on this occasion. The deceased and Foster had some words in regard to an account and settlement between them in which the deceased characterized several items in Foster's account as lies. There was testimony offered tending to show that the deceased started to attack Foster and attempted to drag him from his horse, but was prevented from doing so by the bystanders. He made threats against him and said he and Foster could not live in the same county, and he would get his gun and kill him. The son was off a short distance, and, from the affidavits on application for new trial, it appears saw the difficulty, but took no part in it. The trial Judge declined to allow witnesses to prove the actions and demonstrations of the deceased toward Foster at this time, but permitted them alone to prove that Foster and deceased had a difficulty on the occasion. This, we think, is manifest error. Every circumstance that tended to throw light upon the state of mind and apprehension the defendant was under when he went to his father's relief was not only competent but vital to the crucial question in the case, and that is whether the son was justified in believing it was necessary to interfere in order to save his father's life. The acquittal of the father raises a conclusive presumption that he was guilty of no wrong in this difficulty with deceased.

This being so, if the son really believed, on reasonable grounds, that a deadly assault was being made upon his father, and that owing to the superior power of his antagonist he would be killed or receive great bodily harm as the result of the assault, it was his legal right, as well as his filial duty, to interfere and prevent the killing or maiming of his father, and to use such means as were necessary, under all the circumstances, to effect this purpose.

Previous acts of hostility and demonstrations, if any, made by the deceased toward the father, and coming to the knowledge of the son, and his conduct and demeanor toward him, were important as showing whether the boy had reasonable grounds to believe the deceased was making a deadly assault upon his father, and would kill him or do him great bodily harm unless by some summary means he was prevented. It was error to reject the testimony as to who was the aggressor in this previous difficulty, and what demonstrations were made on that occasion by deceased, especially if they were seen or came to defendant's knowledge.

We do not mean to in any way justify or excuse the defendant for going armed contrary to law. It was an offense to have a pistol upon this occasion, as he did, and for that he might have been punished. But the offense of going armed is one entirely different from a crime committed by using the pistol in an assault upon another, and it is only for

Foster *v.* State.

this latter offense the defendant is on trial before us. The carrying of the pistol is important in this case. only as bearing upon the question of malice, but the record fully shows that defendant was not wearing it with any expectation of using it in committing any assault, and none that he was wearing it with the purpose of using it on the deceased. It was a boyish indiscretion of which, unfortunately, too many young men are guilty.

The judgment is reversed, and cause remanded for new trial.