### ELDER *v.* STATE.

Opinion delivered November 16, 1901.

1. EVIDENCE—RES GESTAE—IMPEACHMENT OF WITNESS.—A statement made by one of the eye witnesses to a homicide, to the effect that he did not know anything to tell, made an hour after the killing, is not admissible as part of the *res gestae*; nor is it admissible for the purpose of impeaching the testimony of such witness where his attention was not called to it, and no opportunity was given to him to explain it.

2. IMPROPER EVIDENCE—PREJUDICE.—Evidence improperly admitted must be treated as prejudicial unless there be something to show that it was not.

3. INSTRUCTION—SELF DEFENSE.—It was not error to instruct the jury "that, in passing on the question as to whether the defendant was acting in his necessary self defense, you are to consider his condition and surroundings at the time, and determine whether the circumstances and surroundings were such as to induce in his mind an honest belief that he was in great danger of losing his own life or of receiving great bodily injury at the hands of deceased; and if you believe from the evidence that such was the case, and that defendant fired the fatal shot while acting under such belief, and that he acted *with due caution and circumspection and without negligence*, then it will be your duty to acquit the defendant."

4. TRIAL—ARGUMENT OF COUNSEL.—Defendant lived in a houseboat, in which he kept a small stock of goods, and testified that he came from behind his counter to stop a quarrel between deceased and another, whereupon the rencounter ensued in which deceased was killed. The court charged that if defendant acted with due caution and without negligence, it would be the jury's duty to acquit. State's counsel, over defendant's objection, argued that defendant was guilty of gross negligence in coming from behind his counter, and that but for this it would not have been necessary to kill deceased. *Held*, that the argument was improper and misleading.

5. INSTRUCTION—SELF DEFENSE.—Defendant asked the court to instruct the jury that if the deceased brought on the difficulty, and the assault made by him was so fierce and violent as to make the defendant believe he was in danger of losing his life or suffering great bodily harm then defendant was not bound to retreat, but had the right to act in his defense until the danger was over. The court modified this instruction by substituting for the words "so fierce and violent" in the instruction the words "with such murderous intent." *Held*, error.

6. SELF DEFENSE—DUTY TO RETREAT.—One who is assaulted in his own home is not bound to retreat, and if the circumstances were such as reasonably to cause the defendant to believe that he was in imminent danger of losing his own life or of receiving great bodily harm, and he did so believe, then he was justified in using the force necessary to protect himself, and, if necessary to this end, he could kill his assailant.

Appeal from Faulkner Circuit Court.

GEORGE M .CHAPLINE, Judge.

*E. A. Bolton* and *John T. Young,* for appellant.

It was error to admit the statement of Bradley after shooting was over as part of the *res gestae*. 9 Cush. 36; 41 Conn. 55; 119 U. S. 99; 8 Wall. 397; McKelvey, Evidence, 278; 43 Ark. 99; 43 Ark. 289. The statement was hearsay evidence. 10 Ark. 638; 62 Ark. 494; 45 Ark. 343. Declarations of an accomplice after the crime is committed, made in the absence of the prisoner, are not admissible. 37 Ark. 67; 45 Ark. 165; 45 Ark. 132. Instructions 3, 4, 5 and 6 are erroneous. 64 Ark. 144; 62 286; 59 Ark. 132; 52 Ark. 45.

*G. W. Murphy, Attorney General,* for appellee.

Declarations of Bradley were competent. Underhill, Cr. Ev. 125; Greenleaf, Ev. §§ 102, 108, 110; 8 Wall. 397; 192 U. S. 401; Best, Ev. 663; 10 Am. Rep. 22; 61 Ark. 590.

Riddick, J. The defendant, W. L. Elder, was indicted for murder of one John Gullett, alleged to have been committed on the 6th day of April, 1899, in Faulkner county. He was tried and convicted of murder in the second degree and sentenced to be imprisoned for the term of five years, from which judgment he appealed.

The facts, briefly stated, are as follows: Elder was the owner of a house boat, on which he and his wife lived, and where he kept a small stock of merchandise. This boat was moored to the bank of the Arkansas river in Faulkner county. People from the opposite side of the river sometimes crossed over to trade at the boat, and it was the custom of Elder to carry such persons across in his skiff free of charge, in order to induce them to trade with him. John Gullett, the person killed, lived with his wife in a tent on the bank of the river not far from the place where Elder's boat was moored. He was the owner of a skiff ferry on the river, and made his living by conveying people across the river. Elder's custom of transferring people across the river to and from his boat free of charge interfered to some extent with Gullett's ferry business. He objected to it, and became angry with Elder on that account, and some of the witnesses say that he made threats against him. But the two men were related by marriage, Elder, though an older man than Gullett, having married his daughter; and from their general conduct towards each other it seems doubtful whether these threats, if made, were intended to be taken seriously. However, Gullett was at times addicted to strong drink, and on the day of the tragedy he spent most of

the afternoon in Elder's house boat, being more or less in an intoxicated condition. As he did not go home for supper, his wife came after him. She found him drinking coffee and eating cakes, which Elder had given him. To her request that he go home with her, he replied that he would go when he got ready; that he was going to settle that matter before he went home. Elder at this time was standing behind the counter where he had been for some time, staying there, as he said, to avoid a difficulty with Gullett, who seemed angry with him. Gullett, after he had finished his coffee, walked up to the counter behind which Elder was standing, threw his arms around Elder's neck, pulled his head down to the counter, and called him "a damned old gray-headed son of a bitch." Thereupon Bradley, a young man, the son of Elder's first wife by a former husband, and a member of Elder's family, caught hold of Gullett, and told him he must have peace. Elder got away, and Gullett then caught hold of Bradley. They struggled with each other a while, and Gullett's wife came up, and asked him to go home with her, and have no fuss. Bradley also said to Gullett that he was his friend, and was for peace. During this struggle between Gullett and Bradley, the stepson of Elder, Elder came from behind the counter with a pistol in his hand, pushed Gullett and Bradley apart, and said: "This thing must be stopped." Gullett then let Bradley go, and turned towards Elder, and advanced upon him. Elder, while Gullett was advancing upon him, and only a few feet away, fired two shots with his pistol. The first shot struck the ceiling of the room, the second struck Gullett; the last shot being fired when Gullett was only a few feet away. Gullett turned and staggered from the boat, and, in attempting to reach the bank, fell into the river. He called for his wife, and she went to him and helped him from the river. Elder and Bradley also went to him, Elder saying as he reached him, "My God! This is like shooting a brother. I never hated to do anything so bad in my life." They assisted Gullett back into the boat where he died in a few minutes.

There is no material difference in the testimony of the several witnesses as to the facts above stated, but there was a difference in their testimony as to whether Gullett at the time he was shot was attempting to cut Elder with a knife, or whether the first shot was fired at Gullett or not. Mrs. Gullett stated that the first shot which struck the roof of the boat appeared to have been fired at Gullett's head, and she and other witnesses for the state testified

that they saw no knife in Gullett's hand; while the defendant and Bradley testified that the first shot was fired above Gullett into the roof of the boat, the defendant saying that he did so purposely to let Gullett know that he had a pistol, and to make him stop, and thus avoid the necessity of shooting him. Both of these witnesses stated that Gullett had a knife in his hand, and was close to Elder, and was cutting at him at the time the last shot was fired, and that his last stroke cut Elder's coat.

After Mrs. Gullett had given her account of the circumstances of the tragedy, she was asked by the attorney for the state to repeat to the jury a statement that Bradley had made after the killing took place. The defendant objected to the proof of this statement as evidence against Elder, but the court overruled the objection, and the witness answered: "After the shooting was over, and after Elder had left, and some time after Gullett had died, Bud Bradley said: 'Well, it is all over now, and there is no one to tell the tale but me, and I will be God damned if I know anything to tell.'" It was shown that this statement was made about one hour after the killing, and the defendant contends that its admission was prejudicial error. The presiding judge allowed it to be proved as a part of the *res gestae,* but we feel convinced that this position cannot be sustained. It is, no doubt, difficult to lay down a rule by which it may be clearly determined in all cases what declarations may be properly received as a part of the *res gestae.* Declarations which emanate directly from the act under investigation, and which explain and illustrate it, are admissible. But mere narrations of a past event, or the declarations of a witness concerning such past event, giving his relations to it and his knowledge or opinion of it, made after the event is complete, and having no immediate connection with it, are not admissible as evidence to prove such event. *Res gestae,* says Mr. Wharton, "are the act talking for itself, not what people say when talking about the act. In other words, they must stand in immediate causal relation to the act,— a relation not broken by the interposition of voluntary individual wariness seeking to manufacture evidence for itself." 1 Whart. Ev. § 259. And, we may add, it would be the same whether the intention of the witness in making the declaration was to benefit himself or another. In either case, if the declaration was the result of an afterthought on the part of the declarant, made concerning a past event, it would be only hearsay, and not competent evidence to prove the facts of such event.

The declaration of Bradley, proved in this case, was, no doubt, made because of his friendship for Elder and his solicitude for his welfare. Yet it emanated not from the killing and the excitement thereof, but from ideas and thoughts that had passed through the speaker's mind after the tragedy was complete. He was, no doubt, at the time of this declaration disquieted by thoughts of the effect of this act upon Elder and others; but the killing itself was completely past, and the fact that the declaration manifested anxiety on the part of Bradley in behalf of Elder did not make it a part of the *res gestae* or competent evidence against Elder, who was not present when it was made, and in no way responsible for it. It is very true that under some circumstances this declaration might have been proved to show the state of feeling existing between the witness Bradley and Elder and to impeach the witness Bradley. In order to introduce this statement as impeaching testimony, the attention of the witness should have been called to it, and opportunity allowed him to explain it. But this statement of Bradley's was proved before he testified, and he was never asked about it while on the stand. It was not introduced as impeaching testimony, but as evidence of the guilt of the defendant, and for this purpose it was clearly incompetent.

There may be more reason for doubt as to whether this evidence was prejudicial or not. But the rule is that evidence improperly admitted must be treated as prejudicial unless there be something to show that it was not. The fact that the attorneys for the state insisted that this declaration should be admitted over the objections of defendant goes to show that both parties considered that it would tend in some degree to sustain the charge against the defendant. That it might have had this effect appears also from a consideration of the other evidence, for there is very little in the facts proved, except the shooting itself, to show malice on the part of the defendant. But this declaration of Bradley may have tended to impress the idea upon the jury that there was some plot or conspiracy between Bradley and the defendant, aimed at Gullett, and which resulted in his death, and may have to some extent injured Elder in the estimation of the jury. For this reason we think it should have been excluded, and are of the opinion that its admission as evidence against Elder was prejudicial error.

The defendant objected to the seventh and eighth instructions given by the court to the jury, but the motion for new trial referred only to the seventh, which is as follows: "You are further instructed that, in passing on the question as to whether the defendant was acting in his necessary self defense, you are to consider his condition and surroundings at the time, and determine whether the circumstances and surroundings were such as to induce in his mind an honest belief that he was in great danger of losing his own life or of receiving great bodily injury at the hands of the deceased; and if you believe from the evidence that such was the case, and that defendant fired the fatal shot while acting under such belief, and that he acted with due caution and circumspection, and without negligence, then it will be your duty to acquit the defendant." The main objection to this instruction urged by the defendant is that it made his acquittal depend upon the question of whether he acted "with due caution and circumspection and without negligence." But the instruction, as an abstract statement of law, can hardly be disputed. It is only in cases of absolute necessity, to prevent death or great bodily harm, or in cases where, though the danger may not be real, there is yet an honest belief on the part of the person defending himself that it is real, and when the circumstances may reasonably cause such belief on his part, that the law justifies or excuses one for taking the life of another. To justify the taking of life in self defense, the slayer must not only act in good faith under the belief that the danger is imminent, but there must be reasonable grounds for such belief on his part. If, through carelessness, or fright, or undue excitement, he takes the life of another, when it was not necessary, and when there were no reasonable grounds to believe that it was necessary, he is not excused. In such cases, if the killing be done under fright or excitement, or through failure to exercise due caution, this may go in mitigation of the offense. It may reduce the grade of the offense from murder to manslaghter, but it furnishes no complete justification or excuse for the taking of life. As we understand the instruction, this was the meaning intended to be conveyed by it; but, as the shooting in this case was not accidental, and as one of the attorneys prosecuting for the state seems to have been misled by the statement in the instruction that the defendant must have acted with due caution and without negligence, it may have been better to have omitted such statement, and to have simply stated to the jury that if Gullett, at the time of the

shooting, was making or attempting to make an assault upon the defendant with a knife under such circumstances as made it reasonable for defendant to believe that he was in immediate danger of losing his life, or receiving great bodily injury at the hands of Gullett, and if defendant did honestly so believe, and if he fired the fatal shot while acting in good faith under such belief, in order to protect himself, then, under the law, he is excused, and the jury should acquit.

This, in substance, is what the instruction means, though there may be some unnecessary repetition in the language used, but the special counsel employed to prosecute for the state seems to have misunderstood it, and based upon it an argument to the jury which seems to us improper and misleading. He, so the bill of exception states, read this instruction to the jury, and asserted that, under the instruction, the defendant was guilty of gross negligence in coming from behind his counter, and that, but for this, it would not have been necessary to kill Gullett, and that by such negligence defendant forfeited his right of self-defense. In other words, because the instruction stated that the defendant, in making his defense to the assault, must have acted with due caution and without negligence, the attorney for the state asserted that the defendant was guilty of such negligence because he came from behind his counter to stop a quarrel in his own house, and therefore forfeited his right of self-defense. But we do not think the instruction justified such an argument. The negligence referred to in the instruction is negligence on the part of the defendant in making his self-defense,—not some prior negligence on the part of the defendant. In cases of this kind it is often said that, in order to justify the taking of life in self-defense, the person assaulted must be himself without fault; but the fault spoken of which it is said the defendant must be without is fault in commencing or carrying on the assault or difficulty, not mere negligence or careless conduct but for which he might have avoided the difficulty. For instance, if a person has notice that a certain man of a violent and dangerous character is angry with him and threatens to kill him, it might be his duty to avoid him as far as possible, so as to avert the necessity of defending himself against a probable assault. But if, in pursuing his lawful vocation, he should through forgetfulness travel a public highway leading near the man's house, when he could have as conveniently gone another way, and thus meets the man he wishes to avoid, and is

assaulted by him, the law does not, on account of such forgetfulness or carelessness, take away or lessen his right of self-defense. The fact that, after hearing of the man's anger and threats, he went near his house might be a circumstance tending more or less to show that the hostile meeting was purposely sought by him, and if that were true he could not justify the killing on the ground of self-defense, unless "he had really and in good faith endeavored to retreat or decline the contest." But, if the meeting was not sought or desired by him, and only brought about by such unintentional carelessness or forgetfulness on his part, he would not be at fault in a criminal sense, and would have the same right of self-defense as one would have who was guilty of no carelessness of any kind.

Now, in this case Elder was in his own house, and he says that he went from behind his counter to stop the struggle between Gullett and Bradley—in other words, that he did it to preserve order in his house. He had a right to preserve order and quiet there, and if he went from behind his counter for that or any other lawful purpose, he was guilty of no negligence that the law would treat as criminal. On the other hand, having invited or permitted Gullett to enter his house, he had no right to kill him in order to keep him quiet, and, if he went behind the counter intending to kill him, or if he fired the fatal shot when Gullett was unarmed and attempting to assault him with his hands only, and when there was no reasonable grounds for Elder to believe that he was in immediate danger of losing his life or receiving great bodily harm, then he was not justified in such act, and is guilty of either murder or manslaughter, according to the circumstances and the amount of provocation and excitement under which the act was done. In neither view of the case do we see any ground for holding Elder criminally responsible for mere carelessness in coming from behind his counter, and we think the argument of counsel to the jury on that point was improper and misleading.

It is a matter of course that appellate courts do not reverse judgments for mere misstatements of law or fact on the part of counsel. Counsel often make their arguments off hand, and are liable to commit errors of that kind which are not subject to review on appeal, for appellate courts sit to review errors of courts, not those of counsel. But the trial court should not permit incorrect and misleading statements of law to be made by counsel to the jury, and where timely objection is made to such statements of

counsel, and the trial judge refuses to interfere, the party except-
ing to such ruling can have it reviewed on appeal. In this case
an objection was made to the argument at the time, the presiding
judge refused to interfere, and to this ruling the defendant
excepted. The refusal of the judge to check counsel was in effect
an indorsement of his statements, and we must therefore hold that
the court erred in permitting counsel for the state to assert to. the
jury that, under the instruction given, if Elder negligently
went from behind his counter, he forfeited his right of self-defense;
for the assertion of counsel that the instruction carried that mean-
ing was, we think, misleading and prejudicial to the defendant.

The eighth instruction asked by the defendant told the jury,
in substance, that if the deceased brought on the difficulty, and
the assault made by him was so fierce and violent as to make the
defendant believe he was in danger of losing his life or suffering
great bodily harm, then defendant was not bound to retreat, but
had the right to act in his defense until the danger was over. The
presiding judge modified this instruction by substituting for the
words "so fierce and violent" in the instruction the words "with
such murderous intent." The instruction, as asked, is not,
abstractly considered, a correct statement of the law, for the fact
that an assault is sudden and violent does not of itself excuse the
one assaulted from endeavoring to retreat if he can safely do so to
avoid the necessity of taking life. An assault of that kind may,
of course, tend, more or less, to show that no opportunity for
retreat was afforded, especially when made with a deadly weapon.
But we need not discuss that question, for, under the admitted
facts of this case, the defendant was in his own dwelling house,
and therefore not required to retreat from one assaulting him
there, without regard to the nature of the assault or the intent of
the assailant. While the fact that he was in his own house did
no justify him in using more force than was necessary, or in killing
Gullett to prevent a mere assault with the hand or fist, yet he had
the right to repel force by force, and to use such means as were
reasonably necessary to protect himself from harm, even to the
extent of taking life, if necessary to do so to preserve his own life
or to pervent great bodily harm.

For these reasons, we think the instruction, as modified, was
calculated to mislead the jury. The main question in this case, as
we see the evidence, was whether the defendant used more force
than was necessary in repelling the assault of Gullett. Being in

S C—42

his dwelling house as we have stated, he was not required to retreat, and had the right to resist force by force, but he had no right to take the life of one attempting to assault him with the hand only. If Gullett at the time he was shot had no knife in his hand, and if defendant had no reasonable grounds to believe he was about to be assaulted with a deadly weapon, he was not justified in shooting Gullett as he did. On the other hand, if Gullett was attempting to assault the defendant with a knife, and the circumstances were such as to reasonably cause the defendant to believe that he was in imminent danger of losing his life or of receiving great bodily harm, and he did so believe, then he was justified in using the force necessary to protect himself, and, if necessary to this end, he could take the life of his assailant.

Most of these questions were properly presented to the jury, but for the errors noted we are of the opinion that the judgment should be reversed, and a new trial granted. It is so ordered.