STATE OF WEST VIRGINIA

*v.*

BONNIE JUNE HAMRIC

(No. 12525)

Submitted April 27, 1966.   Decided July 15, 1966.

4

*Browning, Judge,* dissenting.

*Savage, Goshorn, MacCorkle & Rippetoe, D. J. Savage, David R. Karr,* for plaintiff in error.

*C. Donald Robertson,* Attorney General, *Leo Catsonis,* Assistant Attorney General, for defendant in error.

BERRY, JUDGE:

The defendant, Bonnie June Hamric, was indicted by the grand jury of the Circuit Court of Jackson

County, West Virginia, at the January 1965 term on the charge of first degree murder of Glenn E. Winters. Winters was shot by the defendant on September 7, 1964, and he died on September 20, 1964 as the result of the gunshot wounds. The defendant was convicted by a petit jury of second degree murder on January 18, 1965. The trial court overruled a motion to set aside the verdict and on March 15, 1965, sentenced the defendant to confinement in the West Virginia State Prison for Women for a term of from five to eighteen years. Upon application to this Court a writ of error and supersedeas was granted on November 1, 1965 to the judgment of the Circuit Court of Jackson County of March 15, 1965.

On the night of September 7, 1964, the defendant was sitting in a small "den" in her home at 224 South Street in Ripley, Jackson County, West Virginia, watching television. Her two young children were in bed in a room on the second floor of the house. The room in which the defendant was watching television was rather small, measuring 9 x 10½ feet. The only entrance to the room was a door from the dining room and there was only one window in the room. The evidence indicated the window could not be locked. The Venetian blind on the window appeared to be closed when looking at it from the door in the room but if one stood up close to the Venetian blind which was apparently tilted she could see out of the window to a limited degree. Street lights were burning in the vicinity of the home at the time of the shooting.

The defendant testified that about 9 o'clock she heard noises at the window and could hear the window being raised. She stated she became frightened and called out, "Who's there?" and receiving no answer again said, "Who is there, go away or I will shoot." The defendant then got a shotgun, called for her children to come downstairs and left her home with the children and went across the street to the home of her mother for the purpose of using her telephone to call

her husband as the telephone in her house had been disconnected. When she arrived at her mother's home she called the sheriff's office and asked them to get in touch with her husband who was a deputy sheriff and have him come home immediately. Her husband arrived soon after this call about the same time the city police arrived. She returned to her home accompanied by her mother who made an examination of the outside of the house where the window to the den was located. The window was found opened several inches. Her mother closed the window but later opened it at the request of the defendant in order that her husband could see it. There is no evidence in this case that the window was ever closed again after it had been reopened by the mother on this occasion. The defendant's husband remained at home for about one-half hour during which time he got a twelve-gauge shotgun and showed the defendant how to load it. He then left to resume his duties as a deputy sheriff. The defendant testified that she later loaded the shotgun herself but the state police testified she told them that it was left loaded by her husband and that she did not know how to load it. At the trial she was either unable to break the gun down or refused to break it down. After the children had been put back to bed again the defendant resumed watching television with the shotgun either across the arms of the chair or nearby.

The defendant stated that about 11:30 p.m., while she was still watching television, she observed or heard the Venetian blind and draperies moving and again heard the window being raised slowly and could see the television antenna lead-in wires on the window sill moving. The defendant testified that she became extremely frightened and was afraid that someone was trying to break into her home possibly to do bodily injury to her or her children or to commit a robbery, and that she arose from her chair and standing at the door of the room held the gun to a level even with her

left hip and fired in the direction of the window. The shotgun charge went through the draperies and Venetian blind and continued through the window partly at the top of the bottom sash and partly through the glass just above the sash. The alignment of the hole through the drapery, blind and window indicated that the window was raised an estimated three to four or five inches at the time the shot was fired. Although the defendant did not call out to a supposed intruder on this occasion before firing the shotgun through the window, she stated she ran to the door and called for her mother who arrived from her home across the street at the scene soon thereafter. She testified that she told her mother of her reason for firing the shot and requested her to look outside and see if anyone had been hit. Although the mother made an examination of the area outside of the house near the window she did not see anyone but soon afterwards told her next door neighbor, according to this neighbor, that the defendant had shot Glenn Winters and that an ambulance had been called by him. The mother denied she had said that there was an ambulance called by Winters and stated that city police told her it was Winters who was shot. The defendant remained at her home except for a short period of time when she crossed the street to her mother's home and called again to the sheriff's office for her husband. Her husband arrived soon after the shooting as well as the city police and the state police. The officers stated that upon arriving at the scene they first went to the back of the house, then to where the ambulance was, and came back to the front where the defendant told them she had shot ''him'' and asked what they would do to her. The defendant denied talking to the city police and making this statement to them and said, not specifying to whom she made the remark, that she had shot the gun and asked what would ''happen now.'' An investigation made by the officers at the scene of the shooting disclosed that wood and glass were on the ground for a distance of about three

feet outside the window where the shot went through but that there was no blood or foot marks in the vicinity or outside the window, or on the yard between the defendant's house and an adjoining house. Blood was found on the steps of the trailer in which Glenn Winters lived at the back of the lot on which the adjoining house was located and on the telephone book in the trailer which was lying open at the page where the number for a funeral home was listed which Winters had called to get an ambulance for himself.

The defendant's home was the second house from the corner where a narrow street ran at a right angle with South Street, and on the back end of defendant's lot, which ran a considerable distance backward, was located a barn and utility building. The house next to the defendant's home was a two-story house located on the corner and occupied by a family by the name of Van Winkle. This house was owned by the deceased Glenn Winters and had been occupied by him and his former wife before their divorce in March, 1964. The lot upon which the Van Winkle house was located extended back for a considerable distance like the defendant's lot and had a concrete block garage on it. The area between the garage and the Van Winkle home was level and planted in grass and the deceased lived in a trailer which was located between the Van Winkle house and the concrete block garage. There was no obstruction between the trailer in which the deceased lived and the back of the Van Winkle home. The window of the television room in the defendant's house from which the shot was fired was approximately opposite the carport at the rear of the Van Winkle home.

Between the Van Winkle home and the defendant's home was a hedge running from front to rear which apparently was a dividing line between the two lots. The hedge varied in height from around 4 to 5 feet or more. The hedge was located 10 feet from the defendant's home and 17 feet 7 inches from the Van

Winkle home. The Van Winkle home had a side porch and the defendant's home had a porch on the front of it. The back of defendant's home had a one-story kitchen and bathroom.

The charge from the shotgun struck the deceased in the left upper portion of his body, the major portion being in the area left of the center of the chest and between the collarbone and the abdominal area. Some pellets were found in his left arm. The shotgun charge which entered the deceased's body was not close together. The pellets were scattered and four of them lodged in the heart area which eventually caused his death. Some of the pellets entered the right chest parallel with the nipple and went into the inner part of the right chest. A few of the pellets entered the neck and some penetrated both the left and right lung to a depth of several inches. However, some of the pellets entered the body only slightly and three of them were picked out by the mortician while he was embalming him. The medical testimony indicated that the shot entered the body of the deceased almost directly from the front, and although one doctor could not definitely state that the deceased's arm was up or down when the charge hit him, another doctor testified positively that his arms were down at the time he was struck. During the trial the state attempted to show by witnesses who were familiar with shotguns how shotgun pellets would spread when fired and on each occasion this was attempted the objection of the defendant was sustained on the ground that the witnesses had not qualified as experts.

After the deceased was shot he went back to his trailer, entered it, and called a funeral home to get an ambulance. The owner of the funeral home, Edison Parsons, answered the call which he stated was received between 11:35 and 11:40 p.m. The ambulance driver testified that it was extremely warm that night and that he had been sleeping in nothing but his shorts. He was of the opinion that he arrived at the

scene about four minutes after receiving the call, a quick trip made possible by his running a one-way street. When he arrived at the scene he found Winters crouched between two vehicles which were parked in the rear of the Van Winkle house, and when he called to him, Winters came out, and he asked him where he was standing when shot. Parsons stated that Winters pointed toward the carport at the back of the Van Winkle house and said, "Right there in my yard." Parsons testified that he also asked him who shot him and Winters replied that he did not know. While Parsons was attempting to get Winters into the ambulance Winters said, "Edison, don't let me die." On the way to Charleston, some fifteen minutes after they had left Ripley Parsons stated that Winters told him, "It's not worth it; I don't believe I'm going to make it." Prior to its admission, the evidence as to what Winters said to Parsons before, at the time, and after he was placed in the ambulance was objected to by counsel for the defendant as being improper evidence and a hearing was held out of the presence of the jury. It was the contention of the prosecution that it was admissible as an exception to the hearsay rule as being a part of the *res gestae* and as a dying declaration. The defendant's objection was overruled and the jury was allowed to consider this evidence. The ambulance driver delivered Winters to the emergency room of the Charleston General Hospital in Charleston where he was operated on by a chest surgeon who removed most of the pellets but was unable to remove the four in the heart area. Parsons and Harl Winters, brother of the deceased, testified that there was no wood or glass found on the body of the deceased. The doctors also testified that there was no wood or glass found on his body.

After the first operation immediately after the deceased entered the hospital, which was on the morning of September 8th, he developed breathing difficulty as a result of the chest surgery, and a tra-

cheostomy was performed on September 9th. Winters appeared to improve until September 13th at which time the doctor testified that Winters began to have heart and breathing difficulties and he told Winters that he had taken a turn for the worse and that he might die and if there was anything he wanted to say he had better say it. The doctor then took the tube from his throat, covered the incision made in the trachea and asked Winters who shot him and he replied, the woman or female. The doctor then asked him where he was standing when he was shot and he replied that he was on his side of the hedge or fence. Two brothers of the deceased were present when these statements were made. The doctor stated on cross-examination that he was not completely convinced that Winters would die and did not tell him that he was surely going to die but that he believed Winters thought he might die and realized the gravity of his situation. After these statements were made Winters' condition improved until about September 15th at which time he became confused and thrashed about in bed. This caused a separation of the wounds which necessitated another operation on September 17th to correct the situation, after which his condition worsened and he died on September 20, 1965.

The evidence as to Winter's statement on September 13th was objected to by counsel for the defendant, and the court, after holding a hearing on the matter out of the presence of the jury, admitted such evidence for the jury's consideration as a dying declaration.

The state, in an apparent effort to establish a motive for the shooting, asked the deceased's former wife if she had had a conversation with the defendant concerning her sexual relationship with the deceased, which was immediately objected to by counsel for the defendant. The objection was sustained by the court and the jury was later instructed not to consider the question in any manner. A motion for a mistrial by the defendant because of this question was overruled

by the court. Another witness introduced by the state by the name of Marjorie Roub testified that she became engaged to the deceased the night before he was shot. She stated that she had visited the deceased at his trailer on several occasions and had seen the defendant looking out her back window toward the trailer which testimony was admitted in evidence over the objection of the defendant. The defendant admitted that she looked out the back window of her kitchen while she was working. Although such evidence lacks probative value, the admission thereof does not constitute error.

The defendant was asked on cross examination if she had told one Verna Snyder in January, 1964, at the Village Restaurant in Ripley that Glenn Winters was a "son-of-a-bitch" and that "He can go to hell." Her answer was evasive inasmuch as she stated with reference to the first part of the question, "I don't know I used that language", and with reference to the second part that she did not remember it but that she had said a lot of people could go to hell and that if she said it maybe she was not referring to him.

The record indicates that Verna Snyder had a heart attack the night before she was to testify and when this was announced to the trial court it instructed the jury not to consider the questions asked of the defendant, that is, if she had called the deceased a "son-of-a-bitch" and had said that he could go to hell. The defendant was also asked if there had been any trouble between her husband and the deceased, which was ruled inadmissible by the court. No written statement was ever made by the defendant during the investigation of this case although she was given an opportunity to make one.

Prior to the trial of the case a motion was made by the defendant for a change of venue which was accompanied by nine affidavits of citizens of Jackson County. The affidavits were quite similar in nature, to the

effect that the defendant could not get a fair trial in Jackson County, and were apparently based on stories published in newspapers in Jackson County with regard to the crime. The state filed an answer denying the allegations contained in the motion for a new trial and filed five affidavits therewith to the effect that although there had been considerable comment about the homicide it had gradually died out by the time the case was set for trial. The newspaper stories which were filed in connection with the motion were almost identical to the defendant's testimony at the trial and they contained quotations from the deceased's brother that if Glenn Winters survived, his story would be different from that of the defendant, but there was no statement in the papers as to what the story would have been. In other words, only one side of the story was printed in the newspapers and this was favorable to the defendant rather than to the prosecution.

One of the grounds urged in the motion for a new trial was based on after-discovered evidence. It appears that after the final arguments and before the jury returned its verdict, the attorney for the defendant was informed by a state trooper that the state police had some evidence that wood and glass were found on the clothing worn by the deceased at the time he was shot, and the defendant's attorney claimed that he had no knowledge that any such evidence existed up to that time, although it had been contained in a state police report. Defendant's attorney contended that he had been misled by the evidence and statements of the state to the effect that there was no glass or wood on the person or clothing of the deceased. Affidavits of Lieutenant Barber and Corporal Langley of the State Police filed in support of the motion for a new trial based on after-discovered evidence were to the effect that they examined the deceased's shirt which was worn at the time he was shot and found what appeared to be fine wood particles and that upon an examination of the shirt two small particles of glass were found

mixed with blood and a small wood particle, and that they had so advised both the then prosecuting attorney and the attorney who had been employed by the family of the deceased to prosecute the case. These particles were found under microscopic examination in the laboratory, and a notation of their presence was contained in a state police report. The trial court overruled the motion for a new trial on the ground of after-discovered evidence because it was not timely requested inasmuch as the defense attorney had knowledge of such evidence before the trial was completed and before the jury returned its verdict. Also, the information with regard to the particles could have been ascertained from the state police report and obtained at the same time the motion was granted to inspect the minutes of the grand jury and furnish the defendant with copies of all autopsy reports and reports of the medical doctors with respect to the nature of the wounds and cause of death.

Fifteen assignments of error are relied upon for reversal. They can be consolidated in the following manner:

(1) The Court erred in refusing to grant the defendant a change of venue; (2) in refusing to direct a verdict for the defendant and in refusing to set aside the verdict of the jury and to grant the defendant a new trial because the same was contrary to the law and evidence and also on the ground of after-discovered evidence; (3) in admitting improper evidence; (4) there was improper conduct on the part of the attorney representing the state; and, (5) the court erred in refusing to give instructions 9, 12 and 20, offered by the defendant.

The first assignment of error we will take up is that dealing with the motion for a change of venue. The affidavits and newspaper articles filed with said motion do not indicate that the publicity given to this case was inflammatory or that it would tend to influence the jury in its determinations against returning a fair and

just verdict. The burden is on the defendant to prove the need for a change of venue and the existence of prejudice at the time of the trial. The granting of such motion rests in the sound discretion of the trial court. *State v. Powers,* 91 W.Va. 737, 113 S.E. 912; *State v. Wooldridge,* 129 W.Va. 448, 40 S.E.2d 899; *State v. Pietranton,* 140 W.Va. 444, 84 S.E.2d 774; *State v. Loveless,* 140 W.Va. 875, 87 S.E.2d 273. Point 2 of the syllabus in the *Wooldridge* case clearly states the law with respect to change of venue in the following language: "To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests upon defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused." The mere existence of widespread publicity is not, in and of itself, sufficient to require a change of venue. *Bearden v. United States,* 304 F.2d 532 (C.C.A. 5, 1962).

It does not appear that the trial court abused its discretion in its refusal to grant a change of venue in the case at bar. The affidavits filed by the defendant and by the state were in conflict and the newspaper articles filed in support of the motion, even though given wide publicity, would not be considered prejudicial to the defendant. Therefore, the trial court did not err in refusing to grant a change of venue in this case.

The second group of assignment of errors is the refusal of the trial court to direct a verdict for the defendant, the refusal to set aside the verdict of the jury and to grant the defendant a new trial because it is contrary to the law and evidence, and the refusal to set aside the verdict on the ground of after-discovered evidence. These will be discussed together.

The contention that the trial court should have directed a verdict for the defendant is without merit. The evidence in this case is uncontradicted that the defendant discharged a shotgun through the window of her home and as a result thereof killed Glenn Winters. In such cases the law is clear that where a deadly weapon is used in a homicide there is a presumption of second degree murder and the defendant has the burden of proving that it was justified and the state has the burden of proving that such killing was deliberate and premeditated and raising it to first degree murder, all of which are jury questions. 96 A.L.R.2d, 1436; *State v. Welch,* 36 W.Va. 690, 15 S.E. 419; *State v. Hertzog,* 55 W.Va. 74, 46 S.E. 792. Then, too, it appears from the record that no motion was made for a directed verdict during the trial of this case. Therefore, this assignment of error can not be interposed at this time and was waived. *State v. Zitzelsberger,* 129 W.Va. 229, 39 S.E.2d 835; *State v. Boggs,* 129 W.Va. 603, 42 S.E.2d 1.

The trial court was also justified under the facts of the case at bar in refusing to set aside the verdict of the jury and to grant the defendant a new trial on the ground that the verdict was contrary to the law and evidence. The evidence relative to the shooting which resulted in the death of Glenn Winters clearly presents a question for jury determination. It shows that on the night of September 7, 1964, the defendant was sitting in a small room in her home watching television. It was an extremely hot night although, according to defendant's testimony, the window in the small room in which she was watching television was closed and covered by a Venetian blind and drapes. She testified that about 9 o'clock in the evening she heard the window being slowly raised and called out, ''Who is there, go away, or I will shoot.'' She did not shoot but stated that she got a gun and went over to her mother's home across the street, got her mother to look around the premises outside the house and called her husband. Street lights were burning in the vicinity of the home and her

mother found no one outside the house when she inspected it. Her husband, a deputy sheriff, remained at his home for a period of about one-half hour, at which time he gave the defendant a shotgun and either showed her how to load it or loaded it himself. Her mother, while at the defendant's house, closed the window in the television room but raised the window again at the request of the defendant so that her husband could see the window in a raised position when he came to the house. There is no evidence that the window was ever lowered after the first instance when it was left raised by the mother. However, according to the testimony of the defendant, about 11:30 she heard the window being raised again and observed movements of the antenna wire in the window. Although she saw no one and made no outcry as she had done on the first occasion she grabbed the shotgun which was nearby and fired through the window which was open, making a small hole in the drapes and the bottom sash of the window. Scattered pellets from the charge struck the deceased in the chest and left arm, four pellets penetrating the heart area, some being merely superficial and later picked out by the undertaker. There was no blood or footprints outside the window but blood was found near the deceased's trailer and on the telephone book he used to call the ambulance. A city policeman testified that after the shooting the defendant told him that she had shot "him" and asked what they would do to her. The defendant denied making this statement but said that she had shot the gun and asked what will happen now. After the defendant went to her mother's house and talked with her mother, an episode occurred, as testified to by a neighbor, in which the mother told the neighbor some time later that the defendant had shot the deceased and an ambulance was at the scene. Her mother stated that an officer told her the defendant shot Winters and she, in effect, later denied that she said an ambulance was at the scene. There was evidence that one could see out the window through which the shot was fired by standing in a certain posi-

tion. The jury could consider all of this evidence in arriving at its verdict. In the fact that defendant fired the gun without warning and although she denied saying she shot the deceased, there is evidence for the jury to weigh and consider that she did see whom she was shooting. If the jury believed from the evidence adduced during the trial of this case, which it no doubt did, that the defendant fired the shotgun charge through the window and struck the deceased with knowledge of this fact and he was not attempting to enter the defendant's house through the window and was in his own yard at the time, the shooting of the deceased was neither excusable nor justified, which the jury so found by its verdict. In fact, such evidence would even warrant the returning of a verdict of first degree murder. *State v. Cain,* 20 W.Va. 679; *State v. Tucker,* 52 W.Va. 420, 44 S.E. 427; *State v. Hertzog, supra; State v. McCauley,* 130 W.Va. 401, 43 S.E.2d 454; *State v. Dean,* 134 W. Va. 257, 58 S.E.2d 860.

The jury had the right to infer malice on the part of the defendant because the homicide was committed with a deadly weapon. *State v. Bowles,* 117 W.Va. 217, 185 S.E. 205; *State v. Jones,* 128 W.Va. 496, 37 S.E.2d 103. It is true the defendant relied on self-defense and was not required to retreat because she was in her own home. However, even if she believed that she was in danger of great bodily harm and was attempting to protect herself from apparent danger, she assumed the risk in so doing. *State v. De Board,* 119 W.Va. 396, 194 S.E. 349; *State v. Toler,* 129 W. Va. 575, 41 S.E.2d 850.

Another assignment of error in this category is the refusal of the trial court to set aside the verdict on the ground of after-discovered evidence. This assignment is based on information the attorney for the defendant obtained from a state policeman after the final arguments and while the jury was out deliberating the case but before the verdict was returned. No motion was made to the trial court until after the jury had

returned its verdict and the motion made to set aside the verdict. The state had introduced evidence that there was no glass or wood found on the body or clothing of the deceased. A laboratory microscopic examination of the shirt which the deceased was wearing at the time he was shot was made by the state police. The discovery of the pulverized or fine particles of glass and small particles of wood was obtained by a microscopic examination in the laboratory. It was contained in a state police report and the evidence indicates that the then prosecuting attorney and the special prosecutor were informed and advised of this fact. It is the duty of the regular prosecuting attorney or the special prosecuting attorney to prosecute the offense for which an accused is charged but it is also their duty to see that an accused is afforded a fair and impartial trial. 4 M.J., Commonwealth's and State's Attorney, §4; *State v. Hively,* 103 W.Va. 237, 136 S.E. 862; *State v. Moose,* 110 W.Va. 476, 158 S.E. 715. If a prosecuting attorney or special prosecuting attorney intentionally withholds information as to material evidence which would affect the guilt or innocence of the accused he is prosecuting it would not only be reprehensible but would constitute reversible error. Canon 5, Code of Professional Ethics, 128 W.Va. xxi; *State v. Moose, supra.* However, the defendant could have obtained this information before the trial by requesting a copy of the state police report containing this information. This could have been done by either requesting the prosecuting attorney to furnish a copy of the report or by moving the court for such information, along with other information which the court granted upon request, such as the minutes of the grand jury and lists of the witnesses to be called by the prosecuting attorney and autopsy and medical reports. Then, too, this information indicated that the deceased was some distance away from the window when he was shot because the laboratory examination revealed that only fine particles of glass and wood were present. Had he been close to the window the glass and wood chunks of

considerable size which fell about three feet from it would no doubt have been imbedded in his body with the charge from the shot. It would therefore appear that this evidence was not such as would produce an opposite result at a second trial on the merits and it would appear that the only effect it could have would be to discredit witnesses who testified that there was no glass or wood found on the clothing of the deceased. Since it was necessary for a laboratory microscopic examination to be made to ascertain the presence of glass and wood, the pieces perhaps would not have been visible to the naked eye.

A new trial on the ground of after-discovered or newly discovered evidence is very seldom granted and the circumstances must be unusual or special. *State v. Spradley,* 140 W.Va. 314, 84 S.E.2d 156; *State v. Farley,* 143 W.Va. 445, 104 S.E.2d 265.

The law applicable to the granting of a new trial on the ground of after-discovered evidence is clearly stated in the single syllabus of *State v. Farley, supra,* which reads as follows: " 'A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.'

Point 1, syllabus, *Halstead v. Horton,* 38 W.Va. 727."
Point 2, syllabus, *State v. Spradley,* 140 W. Va. 314.

It can readily be seen that the motion for a new trial on the ground of newly discovered evidence under the circumstances in this case does not meet the requirements on several grounds. It was discovered before the verdict was returned and motion should have been promptly made at that time. The information could have been ascertained by the use of due diligence before or during the trial and because of the nature of the evidence the materiality is very questionable, and the evidence would not have affected the result. The only use of said evidence would appear to be to discredit or impeach witnesses but it was of questionable value even for that. If any of the essential requirements as set out in the syllabus point quoted above are not satisfactorily complied with, a new trial will never be granted on such grounds. *State v. Farley, supra.*

The next group of assignment of errors relates to the admission of improper evidence and improper conduct on the part of the attorney representing the state.

It is the contention of the defendant that it was reversible error to introduce statements made by the deceased to the ambulance driver at the time he arrived at the scene and talked with the deceased and during the time the deceased was on the way to the hospital and statements made to a doctor while he was in the hospital. The ambulance driver arrived on the scene within a few minutes after he was called by Winters and he asked Winters where he was standing when he was shot and the deceased pointed toward the edge of the carport behind the Van Winkle home and said, "Right there in my yard." This evidence would appear to be admissible under the doctrine of *res gestae.* See *Lawrence v. Nelson,* 145 W.Va. 134, 113 S.E.2d 241. When the ambulance driver was placing the deceased in the ambulance he slumped and said, "Edison, don't let me die." On the way to Charleston the deceased

said, "I don't believe I am going to make it, I don't believe it is worth it." With these foundations it would appear that the statement as to where he was shot would qualify as a dying declaration. See 1 Wharton's Criminal Evidence, §297 et seq.

The second occasion of a dying declaration was when the deceased was in the hospital in Charleston and had taken a turn for the worse and the doctor told him he might not survive and asked him if he had anything he wished to say. The tube was removed from his throat and the doctor covered the opening with his finger and the deceased made a statement that a woman or female shot him and that he was on his side of the fence or hedge at the time he was shot. The part of the statement that a woman shot him is immaterial because there is no question in this case but that the defendant fired the shot that killed Winters.

The trial court heard all of the evidence with regard to each of these statements out of the hearing of the jury and ruled that such statements were admissible and then the jury was allowed to hear the evidence. These statements with regard to where the deceased was located at the time he was shot are admissible as res gestae or dying declarations, or both, in the first instance and as dying declarations in the second. 1 Wharton's Criminal Evidence, §297 et seq.; State v. Meek, 107 W.Va. 324, 148 S.E. 208; State v. Graham, 94 W.Va. 67, 117 S.E. 699.

The court heard the evidence with regard to the dying declarations out of the hearing of the jury and ruled on the admissibility before allowing the jury to consider it, in accordance with the "orthodox" rule, adhered to in West Virginia. State v. Meek, supra; State v. Graham, supra. The rule is the same with regard to confessions. State v. Vance, 146 W. Va. 925, 124 S.E.2d 252, and State v. Fortner, decided by this Court June 7, 1966. In the Fortner case the first point of the syllabus deals with this question and reads as

follows: "It is the mandatory duty of a trial court, whether requested or not, to hear the evidence and determine in the first instance, out of the presence of the jury, the voluntariness of an oral or written confession by an accused person prior to admitting the same into evidence, and the failure to observe this procedure constitutes reversible error."

Notwithstanding the fact that the trial court complied with the rules covering the admissibility of the evidence with regard to dying declarations and confessions the defendant offered instruction number 21 which was given by the court stating that the jury was the judge of the weight, credibility and admissiblity of such evidence. The orthodox rule adhered to in this state is that the jury is only concerned with the weight and credibility of such evidence. The court is required to determine its admissibility before such evidence is ever submitted to the jury, all of which was done in the instant case.

It is now the contention of the defendant that it was error to give instruction number 21 offered by said defendant due to the fact that the verdict of the jury did not, after such instruction, contain a statement that the jury had found that the evidence was admissible. For this, defendant relies on the recent United States Supreme Court case of *Jackson v. Denno*, 378 U.S. 368, 12 L.Ed.2d 908, 84 Supreme Court 1774, 1 A.L.R.3rd, 1205, as authority for such contention. The *Denno* case which dealt with a confession was a five to four decision with many written opinions and it is difficult to analyze and to ascertain the exact holding for many reasons. However, it is not difficult to state that it is not applicable for the proposition raised in the case presented here. In the *Denno* case the court did not rule on the admissibility of the evidence but allowed the jury to have the final decision. In the case at bar the trial court made the final decision as to the admissibility of such evidence and in effect inadvertently allowed the jury to consider the admissibility also, all

of which was favorable to the defendant; and although the jury should not have been permitted to consider the admissibility of such evidence the defendant can not take advantage of any error for which she was responsible. *The First National Bank of Peterstown v. Hansbarger,* 129 W.Va. 418, 40 S.E.2d 822. See *State v. Clark,* 64 W.Va. 625, 63 S.E. 402 and *State v. Meek, supra.*

The alleged improper conduct on the part of the attorney representing the state relates to the matter involved in the newly discovered evidence inasmuch as this attorney had introduced evidence that there was no glass or wood on the clothing of the deceased but it is charged that he knew that the laboratory report showed that there was glass and wood on the deceased's clothing. This matter has been heretofore covered and discussed and although questionable would not constitute reversible error. The other improper conduct alleged to have been done by the attorney for the state was the repeated attempts to have improper evidence with regard to the spread of a shot introduced during the trial of the case, a matter which was discussed in connection with the evidence and does not constitute error.

It is also the contention of the defendant that the attorney representing the state who had the right to open and close did not make a fair opening in the closing arguments in violation of Canon 22 of the Code of Ethics, Code of Professional Ethics, 128 W. Va. xxviii.

We have carefully examined the closing arguments made on behalf of both the state and the defendant and find no reversible error in connection therewith. The attorney representing the state could have made a fuller opening argument which should always be done in both criminal and civil cases in order not to mislead or withhold any material points supported by the evidence and relied on to support the state's or plaintiff's position. However, the able closing argument

made by the defendant's attorney anticipated all of the argument contained in the closing argument made by the attorney representing the state.

The trial court sustained objections to much of the other evidence defendant complains of or its admission was not made a point of error in the petition for appeal. Several questions relative to whether defendant had a telephone and why it had been disconnected and for what reason were admitted into evidence and their admission was made a point of error on appeal on the ground that they had no probative value and created suspicion in the minds of the jury. In view of the testimony by defendant about traveling across the street to use her mother's telephone, these would be logical questions, and although the answers produced no worthwhile information we cannot see but that the questions themselves were proper ones.

The objections were not only sustained but the jury was instructed not to consider the question asked the divorced wife of the deceased relative to the sexual relations between the defendant and the deceased. This evidence was apparently an attempt to establish motive which is not necessary in a case of this kind. 1 Wharton's Criminal Law and Procedure, §64; 9 M.J., Homicide, §83.

The questions asked the defendant on cross-examination as to whether or not she had called the deceased a ''son-of-a-bitch'' and said he could ''go to hell'' were answered in an evasive manner, and after it was explained to the trial court that the witness to whom these statements were made or in whose presence they were made had suffered a heart attack and had been taken to a hospital the night before she was to testify, the trial court instructed the jury not to consider such evidence. It is the contention of the defendant that the questions asked these witnesses amounted to reversible error and she relies on the case of *State v. Corbin,* 117 W.Va. 241, 186 S.E. 179, as authority for such contention. The *Corbin* case is not authority for such contention. In the

*Corbin* case not only certain questions were asked but they were allowed to be answered and the court overruled objections to such evidence and allowed the jury to consider it. The objections to the questions in the case before us were sustained and the jury instructed not to consider them. In the *Corbin* case witnesses were used and their testimony allowed to be considered by the jury which amounted to building an inference on an inference. The objection to such evidence should have been sustained and the jury instructed not to consider, as was done in the instant case.

It is the contention of the defendant that the trial court erred in giving instruction number 5 offered by the state and refusing instruction number 9 offered by the defendant. Both of these instructions are instructions on reasonable doubt and in effect amounted to the same thing and it has been held that where there are two instructions in form and effect embodying the same legal principle and amounting to the same thing it is not reversible error to give one and refuse the other. *State v. Rice,* 83 W.Va. 409, 98 S.E. 432. Then, too, the defendant's instruction number 5 and number 8 which were given also dealt with reasonable doubt. It was also contended by the defendant that the trial court erred in refusing to give defendant's instructions 12 and 20. Instruction 12 offered by the defendant is adequately covered by instruction 11 which better fits the evidence in the case at bar. These instructions dealt with the weight and credibility to be given to defendant's testimony, and instruction 12 contained a statement to the effect that there was no evidence by any witness to contradict the testimony of the defendant on any material fact. The testimony of the defendant was contradicted on material facts by several of the state's witnesses. Therefore, it was not error to refuse defendant's instruction number 12. Defendant's instruction 20 which was refused by the court related to evidence in connection with the theory of the defendant and the weight to be given such evidence, but this in-

struction was adequtely covered by defendant's instruction number 18 which was given by the court and the refusal to give instruction number 20 therefore did not constitute error.

Although the majority of the Court were of the opinion that the bills of exceptions had been timely obtained, it should be pointed out that the final order of March 15, 1965, sentencing the defendant to the penitentiary only suspended the execution of the judgment by a stay of execution thereof for a period of ninety days and did not extend the time within which the defendant's bills of exception could be tendered, signed and certified. The order merely stated that the defendant " * * * having moved the Court for a stay of execution of her sentence in order to perfect such appeal the Court doth order that a stay of execution be granted unto the defendant for a period of ninety days in order to perfect her appeal and to get her bills of exception signed by the Court, * * * ". The bills of exceptions or certificates in lieu thereof were filed on June 12, 1965, more than sixty days after the final order and after the adjournment of the January term of court. A bill of exception or certificate in lieu thereof must be tendered to the judge and signed by him within sixty days of the adjournment of the term in which the final order was entered or within sixty days from the date the order is entered if entered in vacation unless the time is specifically extended for the obtaining of such bill of exception or certificate in lieu thereof. Code, 56-6-35 and Code, 56-6-36. It has been held many times by this Court that a stay of execution for a certain period of time and the extension of time within which to obtain bills of exception or certificates in lieu thereof to be filed are separate and distinct procedures and the extension of time for one does not extend the time to obtain the other. *State v. Varner,* 131 W.Va. 459, 48 S.E.2d 171. It was specifically stated in the case of *State v. Workman,* 141 W.Va. 482, 91 S.E.2d 329, at page 487, that a stay of execution of the

sentence or judgment is not equivalent to an extension of time to obtain a bill of exception. An order of a trial court based on a motion for a stay of execution of a judgment, which is sustained by giving as a reason ''in order that petitioner may perfect its appeal'', will not be construed as extending the time within which such litigant may secure the signing of a bill of exception, or, in lieu thereof, a certificate of the evidence. *State v. Consumers' Gas and Oil Company, et al.,* 130 W.Va. 755, 45 S.E.2d 923. This is a jurisdictional matter and even though the point is not raised in any manner the court should take notice of such defect on its own motion. *Crookshank v. Hall,* 139 W.Va. 355, 80 S.E.2d 330. This matter has been discussed in the comparatively recent cases of *Montgomery v. Montgomery,* 147 W.Va. 449, 128 S.E.2d 480 and *Lester v. Rose,* 147 W.Va. 575, 130 S.E.2d 80. In the *Montgomery* case, which was decided in 1962, it was stated: ''It has been repeatedly held by this Court in cases where it is necessary to obtain a bill of exception in an appeal to this Court that a stay or suspension of the execution of a judgment does not extend the time in which to obtain a bill of exception.'' The statements in the *Rose* case were to the same effect, with authorities in connection therewith cited wherein it was stated that a stay of execution of the final judgment does not extend the time in which to obtain a bill of exception or to prepare a case for appeal. For a proper order extending the time in which to have a bill of exception tendered and signed by the trial court see Hogg's Pleading and Forms, 4th Ed., §670. If the signing of bills of exceptions or certificates of evidence in lieu thereof were not timely done this Court could not consider most of the assignments of error relied on in the appeal of this case. However, notwithstanding this situation, we have carefully reviewed all of the assignments of error and do not find that any of them constitute reversible error, as indicated in this opinion.

For the reasons stated herein, the judgment of the Circuit Court of Jackson County is affirmed.

*Affirmed.*

BROWNING, JUDGE, dissenting:

I dissent. It is with respect and deference that I disagree with the other four members of the Court in this case, but in my opinion the evidence falls far short of sustaining a verdict of guilty of murder in the second degree and such verdict, viewed in the light of other errors occurring in the course and conduct of the trial, even though the majority has determined them not to constitute reversible error, neverthless, brings me to the firm conclusion that the defendant has been denied the fair trial to which she was entitled.

The pertinent facts in this case are comparatively simple, the physical facts and much of the state's evidence confirming completely the statements made by the defendant immediately after the deceased was shot as well as her testimony at the trial. A young mother with two sleeping children in the house whose husband, a deputy sheriff, was away on duty discovered some person attempting to enter her house by way of a window and, retreating as far as possible without leaving the room, blindly fired a shotgun at the window, the shot piercing the drape, a venetian blind, and a portion of the sash as well as a portion of the pane of glass. The evidence shows without contradiction that this was the second time during that evening and night that someone had attempted to enter the defendant's home by way of that window. In his opinion, which has been made a part of the record in this case, the able trial judge found: ''She never saw the deceased before she fired the gun. She did not know who or where he was. She only heard a noise at the window as if someone was raising it. Then she loaded the gun, stepped to the door, and fired. He could have retreated in the meantime.'' Reference to the physical facts of the case admits of no alternative that deceased, if he had begun to retreat, had not retreated more than a step or two, and also, that the defendant could have had no knowledge of this supposed retreat. The state's evidence revealed that there were no powder burns on the drape

and in order for the shotgun blast to leave no powder marks the muzzle of the gun must necessarily have been at least three feet distance therefrom. The barrel of the gun was thirty inches in length, thus the defendant could not have stood closer than five and one-half feet from the window at the time the shot was fired. It is uncontradicted that the venetian blind was tilted so that a person in the room could not see out unless he or she stood very close to the window and that the shot pierced the lined drape, additionally covering at least a portion of the window, so that it would have been impossible for the defendant to know the whereabouts of the person at whom she fired or whether, after the noise at the window and the vibration of the television antenna, the intruder had desisted from any attempt at entry.

It is also in evidence, through comparison of the drape, venetian blind and window sash, that the direction of the shot was at a slight angle downward. The height of the window sill from the ground was forty-six inches. To align the holes in the drape and blind with that of the sash, the sash must have been raised three or four inches making the course of the shot approximately fifty inches above the ground. The deceased was approximately five feet eight inches, or sixty-eight inches, tall and the shot struck him mainly in line with the left nipple, approximately fourteen inches from the top of his head or at a level on his body of fifty-four inches. The downward path of the shot is obvious from the window sash in evidence and it thus becomes apparent, with only a rudimentary knowledge of the laws of physics, that the deceased was in a slight crouch in close proximity to the window, on defendant's property, at the time the shot was fired. If he had been standing erect at the window the shot would have centered some four inches lower or, if standing erect at the hedge, still on defendant's property, approximately seven inches lower or near the belt line. If, as the state contended and the jury apparently believed, the de-

ceased was beyond the hedge "in my yard" at the time of the shooting the shot would necessarily have struck him below the waist. As further proof of the downward course of the shot, not one pellet was found in the side of the Van Winkle frame house, a mere twenty-seven and one-half feet from the window through which the shot was fired. The state's contention that, under the above circumstances, the defendant fired blindly out of the window striking the deceased who was on his own premises, and who was "not attempting to enter her house" as assumed in syllabus points 5 and 7 of the majority opinion, is then utterly without foundation and, as necessarily follows, the deceased was on defendant's property at or near her window at the time of the shooting, there is no evidence to contradict her statement that the deceased was attempting, or gave her reasonable grounds to believe that he was attempting, to enter her home for some malevolent purpose at the time she fired the shot. It does not require the citation of authority to note that, while the jury determines the credibility of witnesses and the weight to be given to their testimony and is entitled to draw reasonable inferences from the proved facts in a case, such inferences must be reasonable and the jury should not be permitted to ignore physical facts totally inconsistent with such inferences and this Court is not compelled to accept as true, because apparently so found by a jury with the approval of the trial court, facts which in the nature of things could not have occurred in the manner and under the circumstances narrated.

The rule is well established in this jurisdiction and elsewhere that a man's home is his castle, and that he has a right to protect it and those within it from intrusion or attack. A person may repel force with force in defense of his person, habitation, or property against one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as murder, rape, robbery, arson, burglary, etc. In these cases he is not obligated to retreat but may pursue his adversary

until he has secured himself from all danger. *People v. Lewis*, 117 Cal. 186, 48 P. 1088, 59 Am. St. Rep. 167; *Sullivan v. State*, 102 Ala. 135, 15 So. 264, 48 Am. St. Rep. 22; *Carroll v. State*, 23 Ala. 28, 58 Am. Dec. 282; *People v. Hecker*, 109 Cal. 451, 42 P. 307, 30 LRA 403; *Powell v. State*, 101 Ga. 9, 29 S.E. 309, 65 Am. St. Rep. 277; *State v. Thompson*, 9 Iowa 188, 74 Am. Dec. 342; *State v. Robertson*, 50 La. Ann. 92, 23 So. 9, 69 Am. St. Rep. 393; *State v. Bonofiglio*, 67 NJL 239, 52 A. 712, 54 A. 99, 91 Am. St. Rep. 423; *Erwin v. State*, 29 Ohio St. 186, 23 Am. Rep. 733; 18 ALR 1290; 2 LRA (NS) 53. Regardless of any general theory to retreat as far as practicable before one can justify turning upon his as-sailant and taking life in self-defense, the law imposes no duty to retreat upon one who, free from fault in bringing on a difficulty, is attacked at or in his own dwelling or home. *Hutcherson v. State*, 165 Ala. 16, 50 So. 1027, 138 Am. St. Rep. 17; *State v. Turner*, 95 Utah 129, 79 P. (2d) 46. Upon the theory that a man's house is his castle, and that he has a right to protect it and those within it from intrusion or attack, the rule is practically universal that when a person is attacked in his own dwelling he may stand at bay and turn on and kill his assailant if this is apparently necessary to save his own life or to protect himself from great bodily harm. *State v. Frizzelle*, 243 N.C. 49, 89 S.E. 2d 725, 52 ALR 2d 1455; *Hill v. State*, 194 Ala. 11, 69 So. 941, 2 ALR 509; *Karr v. State*, 100 Ala. 4, 14 So. 851, 46 Am. St. Rep. 17; *Lee v. State*, 92 Ala. 15, 9 So. 407, 25 Am. St. Rep. 17; *Brinkley v. State*, 89 Ala. 34, 8 So. 22, 18 Am. St. Rep. 87; *Elder v. State*, 69 Ark. 648, 65 SW 938, 86 Am. St. Rep. 220; *People v. Lewis*, 117 Cal. 186, 48 P. 1088, 59 Am. St. Rep. 167; *State v. Bennett*, 128 Iowa 713, 105 NW 324, 5 Ann. Cas. 997; *Estep v. Com.*, 86 Ky. 39, 4 SW 820, 9 Am. St. Rep, 260; *Young v. State*, 74 Neb. 346, 104 NW 867, 2 LRA (NS) 66; *People v. Tomlins*, 213 NY 240, 107 NE 496, Ann. Cas. 1916C 916; *State v. Brooks*, 79 SC 144, 60 SE 518, 17 LRA (NS) 483, 128 Am. St. Rep. 836, 15 Ann. Cas. 49; *State v. Patterson*, 45 Vt. 308, 12 Am. Rep. 200; *State*

*v. Turner,* 95 Utah 129, 79 P. (2d) 46; *State v. Cushing,* 14 Wash. 527, 45 P. 145, 53 Am. St. Rep. 883; *Palmer v. State,* 9 Wyo. 40, 59 P. 793, 87 Am. St. Rep. 910; 67 LRA 541; 2 LRA (NS) 71; 45 LRA (NS) 72; 74 Am. St. Rep. 727; 93 Am. St. Rep. 261; 5 Ann. Cas. 999; 15 Ann. Cas. 51; Ann. Cas. 1916C 918. Furthermore, the fact that retreat can be safely effected does not render it necessary for a man assaulted in his dwelling to retreat therefrom. *Brinkley v. State,* 89 Ala. 34, 8 So. 22, 18 Am. St. Rep, 87; *Estep v. Com.* 86 Ky. 39, 4 SW 820, 9 Am. St. Rep. 260; *Palmer v. State,* 9 Wyo. 40, 59 P. 793, 87 Am. St. Rep. 910.

The legislature of this state has not seen fit to lay down a rule with regard to this matter and therefore as the constitution of this state provides the English common law is still in effect and binding upon this Court. The judicial decisions in England, the colonies and the states since the separation in an uninterrupted and undeviating line have adhered to this principle—a person not only may take life in his own defense, but may do so in defense of other persons where the circumstances warrant. He may do so where the relationship of wife, parent, or child exists. The rule is the same as to the right of a wife to defend her husband or her child. Many of the cases say it is not only the right of such person to protect their loved ones but it is their legal duty to do so. *Bailey v. People,* 54 Colo. 337, 130 P. 832; 45 LRA (NS) 145, Ann. Cas. 1914A 1142; *Dukes v. State,* 11 Ind. 557, 71 Am. Dec. 370; *Utterback v. Com.,* 105 Ky. 723, 49 SW 479, 88 Am. St. Rep. 328; *Campbell v. Com.,* 88 Ky. 402, 11 SW 290, 21 Am. St. Rep. 348; *Estep v. Com.,* 86 Ky. 39, 4 SW 820, 9 Am. St. Rep. 260; *Morrison v. Com.,* 24 Ky. L. Rep. 2493, 74 SW 277, 67 LRA 529; *State v. Francis,* 152 SC 17, 149 SE 348, 70 ALR 1133; *State v. Douglas,* 115 SC 483, 101 SE 648, 8 ALR 656; *State v. Cook,* 78 SC 253, 59 SE 862, 15 LRA (NS) 1013, 125 Am. St. Rep. 788, 13 Ann. Cas. 1051; *Foster v. State,* 102 Tenn. 33, 49 SW 747, 73 Am. St. Rep. 855; *Mayhew v. State,* 65 Tex.

Crim. Rep. 290, 144 SW 229, 39 LRA (NS) 671; *Wood v. State,* 128 Ala. 27, 29 So. 557, 86 Am. St. Rep. 71; *State v. Turner,* 246 Mo. 598, 152 SW 313, Ann. Cas. 1914B 451; *Johnson v. State,* 125 Tenn. 420, 143 SW 1134, Ann. Cas. 1913C 261; *Snell v. State,* 29 Tex. App. 236, 15 SW 722, 25 Am. St. Rep. 723; *Ross v. State,* 10 Tex. App. 455, 38 Am. Rep. 643; *People v. Forte,* 269 Ill. 505, 110 NE 47, LRA 1916B 924; 13 Ann. Cas. 1058. The modern rule as to homicide in defense of the habitation is that if an assault on a dwelling and an attempted forcible entry are made under such circumstances as to create a reasonable apprehension that it is the design of the assailant to commit a felony or to inflict on the inmates a personal injury which may result in the loss of life or great bodily harm, and the danger that the design will be carried into execution is imminent and present, the lawful occupant of the dwelling may lawfully prevent the entry, even by the taking of the life of the intruder. *Alberty v. United States,* 162 US 499, 40 L. ed. 1051, 16 S. Ct. 864; *Carroll v. State,* 23 Ala. 28, 58 Am. Dec. 282; *State v. Perkins,* 88 Conn. 360, 91 A. 265, LRA 1915A 73; *Wilson v. State,* 30 Fla. 234, 11 So. 556, 17 LRA 654; *Powell v. State,* 101 Ga. 9, 29 SE 309, 65 Am. St. Rep. 277; *Foster v. Shepherd,* 258 Ill. 164, 101 NE 411, 45 LRA (NS) 167, Ann. Cas. 1914B 572; *Estep v. Com.,* 86 Ky. 39, 4 SW 820, 9 Am. St. Rep. 260; *Williams v. State,* 127 Miss. 851, 90 So. 705; *Young v. State,* 74 Neb. 346, 104 NW 867, 2 LRA (NS) 66; *Thompson v. State,* 61 Neb. 210, 85 NW 62, 87 Am. St. Rep. 453; *State v. Bailey,* 27 NM 145, 198 P. 529; *State v. Gray,* 162 NC 608, 77 SE 833, 45 LRA (NS) 71; *Hudgens v. State,* 166 Tenn. 231, 60 SW (2d) 153; *Newman v. State,* 58 Tex. Crim. Rep. 443; 126 SW 578, 21 Ann. Cas. 718; *State v. Patterson,* 45 Vt. 308, 12 Am. Rep. 200; *Palmer v. State,* 9 Wyo. 40, 59 P. 793, 87 Am. St. Rep. 910. *State v. Sorrentino,* 31 Wyo. 129, 224 P. 420, 34 ALR 1477, is directly in point and holds that where one hears another attempting to force his way into his habitation in the night he is not bound to call out or give an alarm in

order to escape an imputation of malice if he kills the intruder in preventing the forced entry. In *State v. Gray*, 162 NC 608, 77 SE 833, 45 LRA (NS) 71, it was held that a householder who is awakened by an intruder kicking at the door and threatening to enter the dwelling will be justified, upon the intruder's breaking a window to effect an entrance, in killing him, if the householder believes, or has reasonable ground to believe, that his act is necessary to prevent harm to himself or his family, or the violent entry of his home. *Furthermore, the law does not require that the danger to the householder be real, that is, that the peril actually exist to entitle the householder to resist even to the taking of life.* Carroll v. State, 23 Ala. 28, 58 Am. Dec. 282; *State v. Perkins*, 88 Conn. 360, 91 A. 265, LRA 1915A 73; *Thompson v. State*, 61 Neb. 210, 85 NW 62, 87 Am. St. Rep. 453; *State v. Gray*, 162 NC 608, 77 SE 833, 45 LRA (NS) 71; *Newman v. State*, 58 Tex. Crim. Rep. 443, 126 SW 578, 21 Ann. Cas. 718. The law does not require of a defendant who commits a homicide under the mental excitement induced by wrongful assault upon his habitation the same circumspection and cool and deliberate judgment as might otherwise be the case. *Patten v. People*, 18 Mich. 314, 100 Am. Dec. 173. Even under circumstances which do not justify the act of committing homicide, if done in preventing an unlawful entry into a dwelling, there is no case in this country except the instant one which has not held that that circumstance reduces the degree of the crime to manslaughter. See also: 25 ALR 523, s. 32 ALR 1514, and 34 ALR 1488.

This Court, until the decision of this case, has been aligned with the cited authority. In *State v. Manns*, 48 W. Va. 480, 37 S. E. 613, the defendant was tried for murder, found guilty and sentenced to be hanged. The evidence showed that his neighbor, a medical doctor, had been on a rampage throughout the day of the killing, firing his gun at random and finally firing a shot into defendant's home where he and his family were having dinner. The defendant secured a weapon, went

to the corner of his house and killed his rampageous neighbor. At that moment neither the defendant nor his family was in immediate danger, but this Court had no difficulty in reversing that conviction and finding that the defendant had a right to do exactly what he did. There, as here, a dangerous and deadly weapon was used to kill one who was in a manner threatening a neighbor's family. The Court said, among other things, in the opinion, "Every man has the right of self-defense of himself and family, and when attacked in his home, he is not bound to flee therefrom before exercising that right, but smarting under strong provocation he may exceed the bounds set by the law, and knowingly use greater force than necessary, and yet he would not be guilty of murder in the first degree but of a lesser offense." The Court further said that the jury in such a case should be properly instructed so that it may not "be easily misled into giving a verdict contrary to law."

In *State v. Clark,* 51 W. Va. 457, 41 S. E. 204, the defendant killed one John Dempsey and was found guilty of murder of the first degree. This Court affirmed that conviction by a three to one majority, but the principles laid down therein show conclusively that the defendant in the instant case did not get a fair trial. Briefly, these were the facts in the *Clark* case: The deceased and Clark lived on neighboring farms on Pigeon Creek in Mingo County, Dempsey owning his farm and Clark's wife being the owner of the one they lived on. There was animosity between them, apparently growing out of religion. It was necessary for Dempsey to cross a small portion of the Clark land in going from his home in a certain direction. Clark put up a barrier and notified the deceased not to trespass thereon; the deceased came riding his mule to that place and found Clark and another person, the only other witness; a verbal altercation occurred, each vowing to go to his home and get a weapon; and Clark went and got his shotgun and Dempsey returned with an ax. The jury naturally did not have the benefit of Demp-

sey's testimony, but Clark and the other witness said that Dempsey came toward Clark using profane language and threatening him with great bodily harm. Although the deceased was still astride his mule, Clark shot and killed him. The conviction was affirmed by this Court. This is the fourth syllabus point of that case: "In cases of assault, not made with the intent to kill or do great bodily harm, *or when the person assaulted is not in his dwelling-house,* he cannot justifiably kill his assailant without first having retreated 'to the wall.'" (Italics supplied.) State's Instruction No. 5 told the jury that if they believed from the evidence that Dempsey was about to commit a trespass against the property of the defendant or his wife and that if, in attempting to prevent the trespass, the killing resulted, they should find him guilty of murder. Although the Court criticized the instruction it was not held to be reversible error but the Court said this about it: "The objection to this is, that it failed to inform the jury that the trespass, although insufficient to justify the killing, was proper to be considered as provocation which might reduce the offense to manslaughter. . . . 'A bare trespass against the property of another, *not his dwelling-house,* is not sufficient provocation to warrant . . .'" the use of a deadly weapon. (Italics supplied.) The Court also said: "Under such circumstances, neither the possession of the gun at the time and place in question nor the prisoner's having gone after it and brought it there, would have afforded ground for the inference that he premeditated the killing of deceased." And, after further stating that a man must retreat to the wall before killing one who is merely trespassing upon property, the Court said: "The only exception to this is where a man is assaulted without intent to kill *in his own dwelling house.* There, he need not run or retreat, but he cannot kill his adversary unless it is necessary to save his own life, or prevent other felony." (Italics supplied.) This observation by Judge Poffenbarger is pertinent to the fallacy of picking one instruction out of a former case

and giving it in another where the facts may be dissimilar. He said: "Nothing is better settled than that every instruction must be founded upon the evidence in the case and in view of the circumstances of the case. An abstract proposition of law which may be applicable to one case may be wholly inapplicable to another by reason of the difference in the evidence and circumstances." He quoted from Wharton on Evidence, § 1237, to this effect: "Presumptions of fact, in other words, relate to unique conditions, peculiar to each case, incapable of exact reproduction in other cases; and a presumption of fact applicable to one case, therefore, is inapplicable, in the same force and intensity, to any other case. But a presumption of law relates to whole categories of cases, to each one of which it is uniformly and equally applicable, in anticipation of the facts developed on trial." Even upon the facts of that case, Dent, President, dissented, quoting with approval from *People v. Payne,* 8 Cal. 341, the following language: "The owner of property in the possession of the same has a right to use such force as is necessary to prevent a forcible trespass; and where a trespasser goes with the intent and with the means to commit a felony, if necessary to accomplish the end intended, the owner of the property may repel force by force to the extent of killing the aggressor." He said further that *"The question presented by the undisputed evidence was not one of slight provocation or of mutual combat or of a mere trespass free from malice and force."* (Italics supplied.) He concluded his opinion thus: "If the forcible, unlawful, malicious and wilful conduct of the deceased had been presented to the jury in its true legal light they would not have found a verdict for murder in the first degree. The prisoner is thereby made to suffer for the death of the deceased brought on by reckless and lawless indifference to the just rights of others. This may be the end of human law, but it is not justice."

I am of the firm opinion that the giving of State's

Instruction No. 12 was reversible error. That instruction is as follows: "The Court further instructs the jury that if you believe beyond a reasonable doubt that Bonnie June Hamric inflicted a mortal wound with a deadly weapon in her previous possession upon Glen Winters, without any, or upon very slight provocation, then this is prima facie, wilful, deliberate and premeditated killing and throws upon Bonnie June Hamric the necessity of proving extenuating circumstances and unless Bonnie June Hamric proves such extenuating circumstances or the circumstances appear from the case made by the State, she is guilty of murder of the first degree." The word "provoke" connotes umbrage, harassment, offense, inflamation, etc. In my opinion the phrase "slight or no provocation" was inappropriate and reversible error as used in the state's instruction No. 12 given by the trial court to the jury. In the *Manns* opinion it was stated: "Jurors look to the court for advice as to the law, and when the court gives them an instruction, they have the right to rely on it as stating the law of the case. What in law is deemed slight provocation they do not know, and if the court uses the language above they take it for granted that the provocation, if any at all, was only slight in law, otherwise the court would not give such an instruction." Finally, Judge Dent said: "A law abiding citizen would have concealed his family and sought the aid of an officer of the peace, if he could be found. . . . But an average man with an average temperament would have given blow for blow, shot for shot, eye for eye, tooth for tooth, life for life. Whether the prisoner went farther than the law justifies him in doing he has the right to have an impartial jury of his peers, *properly instructed* as to the law to say, and he has the right to have his defense presented by proper instructions." (Italics supplied.) In *State v. Sauls,* 97 W. Va. 184, 124 S. E. 670, the theory propounded by this instruction that murder automatically comes into being upon the killing of one person by another by firing a deadly weapon was

totally and completely rejected and, in my opinion, has never been resurrected since that case. This is the eighth point of the syllabus in the *Sauls* case: "An instruction that the jury may infer malice, the intent to kill, and the willfulness from the unlawful use of a deadly weapon previously obtained, and which omits mention of any of the circumstances of the case which might, in the minds of the jurors, rebut such inferences, is erroneous." This is the pertinent part of syllabus point seven of that case: ". . . an instruction in the trial of one for murder, which charges the jury that a homicide is presumed to be murder in the second degree, without referring to the particular circumstances of the instant case is abstract and too comprehensive." In *State v. Best,* 91 W. Va. 559, 113 S. E. 919, this Court held that an instruction to the effect that "malice might be inferred, without reference to the facts and circumstances calculated to rebut such inference of malice", is misleading.

In *State v. Whitt,* 96 W. Va. 268, 122 S. E. 742, the Court states in the third syllabus point which, insofar as is material, says: "Where the facts and circumstances of a homicide case are such that they may in the minds of the jurors rebut a mere inference of malice on the part of the accused, an abstract instruction to the effect that deliberation, wilfulness and malice may be inferred from the use of a deadly weapon; and which omits to mention any of the various circumstances tending to rebut such inference, is erroneous." Incidentally, that instruction was taken from *State v. Welch,* 36 W. Va. 690, 15 S. E. 419, and had been severely criticized by Judge Brannon in that case but not held to be reversible error. In the opinion in the *Whitt* case the Court very appropriately said: "An instruction should have reference to the facts shown in the case on trial. For this reason it is as a general rule bad practice to lift bodily from another case an instruction probably applicable to the facts shown there and use it in a case where the facts shown are totally different." State's Instruction No.

simply told the jury that if Bonnie June Hamric killed Glenn Winters with a deadly weapon *without any or upon very slight provocation* that it was prima facie a wilful, deliberate and premeditated killing and unless Bonnie June Hamric could prove extenuating circumstances or such were shown by the state she was guilty of murder of the first degree. It is not the law of this state that a woman, where in her home alone with her two young daughters, who retreats to the wall of that home and then blindly fires at an intruder who is at the window is prima facie guilty of murder. As was very appropriately said in the *Whitt* case, "It is sufficient to say that the defendant is entitled to a trial according to the rules of law."

Although, as heretofore pointed out, the physical facts show that the deceased must have been on defendant's property at the time of the shooting, his proximity to the window becomes of crucial importance to further corroborate the defendant's recital of the circumstances. The state's evidence shows that glass and wood particles from the window did not extend into the yard more than three feet. The existence or non-existence of such debris on the clothing of the deceased thus becomes vital and, while I agree with the majority that the defendant did not make a proper showing for a new trial upon the ground of *after discovered evidence,* I am firmly convinced that the deliberate *suppression of evidence* that such debris did appear on the clothing of the deceased was reversible error. In the affidavits of Lt. R. J. Barber and Cpl. R. F. Langley of the department of public safety, experts in their fields in the criminal identification bureau, both officers affirm that the state had such information in its possession at the time the trial began. However, the state did not call these men as witnesses, but introduced other witnesses, who had no occasion to observe the fact, to prove the contrary. This, in my opinion, violated the due process clauses of the constitutions of this state and of the United States. Section 5, paragraph

2 of the Code of Professional Ethics governing the conduct of prosecuting attorneys reads: ''The primary duty of a lawyer *engaged in public prosecution* is not to convict, but to see that justice is done. *The suppression of facts or the secreting of witnesses capable of* establishing the innocence of the accused is highly reprehensible.'' (Italics supplied.) This statement is contained in 42 Am. Jur., Prosecuting Attorneys, Sec. 20: ''In criminal prosecutions, it has been said that it is as much the duty of prosecuting attorneys to see that a person on trial is not deprived of any of his statutory or constitutional rights as it is to prosecute him for the crime with which he may be charged. The public interests, however, demand that a prosecution should be conducted with energy and skill. While the prosecuting officer should see that no unfair advantage is taken of the accused, yet he is not a judicial officer. Those who are required to exercise judicial functions in the case are the judge and the jury. The public prosecutor is necessarily a partisan in the case. If he were compelled to proceed with the same circumspection as the judge and jury, there would be an end to the conviction of criminals. Zeal in the prosecution of criminal cases is therefore to be commended and not condemned. If convinced of the defendant's guilt, he should, in an honorably way, use every power that he has to secure his conviction. At the same time, it is the duty of the prosecuting attorney, who represents all the people and has no responsibility except fairly to discharge his duty, to hold himself under proper restraint and avoid violent partisanship, partiality, and misconduct which may tend to deprive the defendant of the fair trial to which he is entitled; and it is as much his duty to refrain from improper methods calculated to bring about a wrongful conviction as it is to use every legitimate means to bring about a just one. It is the duty of the prosecutor to see that nothing but competent evidence is submitted to the jury; and, above all things, he should guard against anything that would prejudice

the minds of the jurors, and tend to hinder them from considering only the evidence introduced. He should never seek by any artifice to warp the minds of the jurors by inference or insinuations.'' This is a comment in 4 M.J., Commonwealth's and State's Attorney, Section 6: ''An attorney for the state may prosecute vigorously, so long as he deals fairly with the accused; but he should never become a partisan, intent only on conviction. Accordingly, it is a flagrant abuse of his position to refer, in his argument to the jury, to material facts outside the record, or not fairly deducible therefrom. For prosecuting attorneys in the conduct of criminal trials have a quasi-judicial position and owe a duty to the courts as well as to the state to observe rules of practice and procedure which serve to give those tried for crime the safeguards of a fair trial.''

In the early morning of September 8th, Harl Winters, a brother of deceased (who stated under oath that he had employed the special prosecutor in this case, as he had a right to do) testified that he turned deceased's shirt over to Trooper Britton at a Charleston hospital where deceased had been taken. Trooper Britton turned the shirt over to Cpl. Casey, who thereafter gave it to Cpl. Langley. Cpl. Langley stated in an affidavit that on or after September 10, 1964, ''he examined the shirt delivered to him, both visually and miscroscopically, and that near the left pocket of the said shirt amidst the blood upon the said shirt, he discovered two particles of broken or shattered glass, a small piece of wood and what appeared to be a flattened pellet from a shotgun shell. All of these articles were carefully saved by him and are now in the possession of the Criminal Identification Bureau. There were also about the shirt what appeared visually to be fine particles of what appeared to be wood. This information was incorporated into a written report mailed to Corporal R. L. Casey, a member of the Department of Public Safety at Ripley, West Virginia.'' This information was supplied di-

rectly to the special prosecutor and the Prosecuting Attorney of Jackson County, West Virginia, in oral conversation on September 30, 1964, and the suggestion made that the shirt be further examined by Lt. R. J. Barber. The affidavit of Lt. Barber is to the effect that he examined the shirt but was not requested to, and ". . . made no specific scientific examination to determine whether there were particles of wood embedded in the shirt, but that he recalls *from a merely visual examination* of the shirt that what appeared to be fine wood particles were on the shirt about the region where the said Glen Winter apparently had been shot. Affiant further states upon his oath that such examination as he made was made at the request of Corporal Langley and the special prosecutor but that thereafter he was never requested for any report of his findings, nor did he make such report." (Italics supplied.) Cpl. Langley was subpoenaed as a witness for the state and appeared on the opening day of the trial which lasted four days. The trial court in its opinion said: "Corporal R. F. Langley was at the trial *at least one day* as a witness for the State although he did not testify." (Italics supplied.) Corporal Langley was not called, however, and the attorneys for the state proceeded to prove with regard to any foreign matter upon the shirt exactly the opposite of what they knew to be true. In other words, they knew that the witnesses they offered were totally ignorant of that about which they testified. Briefly, these are the witnesses and what they testified to at the trial. Harl Winters, brother of the deceased, testified that Edison Parsons, the ambulance driver, called him from the Charleston General Hospital and told him what had happened to his brother Glenn. He went directly to the hospital, delivered the deceased's shirt to Trooper Britton, who delivered it to Cpl. Casey, who in turn delivered it to Cpl. Langley. At that time this witness would not have known whether it was important or unimportant to determine whether there was glass or wood or any other substance on his

brother's shirt but he testified that he did examine it "to see if there was any wood or glass in and about the shirt" and there was no wood or glass on the shirt. The ambulance driver and the attending physician testified to the same effect. This question was pointedly asked each of these witnesses, none of whom had reason to closely examine the shirt, while Cpl. Langley and Lt. Barber, who, as the prosecutor and special prosecutor well knew would have testified to the contrary, were not called. I consider that vicious reversible error and violative of the constitutional rights of the defendant, especially due process. In the same manner the state attempted to qualify two or three witnesses as experts on the pattern of a shot fired from a twelve gauge single barrel shotgun using size seven and one-half shot. None qualified and they were not permitted to testify, however, the expert in the office of the criminal investigation bureau of the department of public safety of this state on guns, the firing of them, the spread of the pattern, etc., is one Cpl. R. F. Langley, who, though present, was not only not called but apparently after one day's attendance at the trial, was excused by the state, which had subpoenaed him. It may be presumed that if he had been used by the state the pattern of the shot and the spread of it on the deceased's body would have been consistent with defendant's statement concerning where she was when she fired the shot, taking into consideration that the small shot passed through the draperies, venetian shades and the glass and part of the sash of the window. Of particular significance, I believe, is the statement in Cpl. Langley's affidavit that there was one *battered shot* upon the shirt which he examined.

Pointing up the atmosphere in which this defendant was tried and which I believe precluded her from receiving a fair trial, the state placed the former wife of the deceased on the stand and asked this question: "Mrs. Winters, did you ever have a conversation with Bonnie June Hamric, the defendant, concerning her sexual relationship with Glen Winters?" The ques-

tion was objected to and such objection was sustained, but the harm had been done. The prosecution thus informed the jury, by fair means or foul, that at some time prior to the shooting of Glenn Winters, he and the defendant were engaged in an extramarital sexual relationship; that shortly before he was shot Winters discarded the defendant for one Marjorie Roub; and that because of defendant's jealousy of Marjorie Roub and the deceased she shot and killed the latter. The following testimony was elicited upon direct examination of Marjorie Roub, and the court permitted the jury to consider such evidence in determining the guilt or innocence of the defendant:

"Q. When did you first meet Glenn Winters?

"A. In January of '64.

". . .

"Q. Would you tell us the last time you can recall visiting that trailer before the night of September 7, 1964?

"A. It was the Friday night before.

"Q. Had you ever visited the trailer, visited Glenn Winters when you observed Bonnie Hamric?

"Objection: Overruled.

"A. Yes.

". . .

"Q. Where was she located when you saw her?

"A. In her window.

"Objection: Mr. Savage. Motion to strike.

"The Court: The motion is refused. (Exception).

"Q. You said in her window, would you tell me what window she was in when you saw her?

"A. It would be the back window on the left hand side.

"...

"Q. Where were you standing at the time you saw her?

"A. We were sitting in the trailer.

"Q. Were you with someone in the trailer?

"A. I was with Glenn."

This witness then testified that on five or six occasions while she and the deceased were sitting in the trailer Bonnie June Hamric stared at them. Then comes what, in my opinion, was so viciously prejudicial that a mistrial should have been declared at that point if one had been sought. This witness was permitted to testify that on the night before he was killed she and Glenn Winters became engaged to be married; that he gave her an engagement ring; and she was allowed, over objection, to hold up her hand and show the engagement ring on her left ring finger.

In *State v. Corbin,* 117 W. Va. 241, 186 S. E. 179, the conviction of a defendant of voluntary manslaughter in the Circuit Court of Harrison County was reversed by this Court primarily because of the admission over objection of evidence very similar to that permitted in this case, the only difference being that there was evidence of a relationship between Corbin, a police officer of the town of Nutter Fort, and a Mrs. Longenette, a married woman. Many witnesses testified to seeing this couple in conversation near the house, inside the house, and perhaps on other occasions, although there was nothing in the testimony to indicate that any immoral relationship existed. A disturbance occurred in the Longenette home, the defendant was called as a police officer by Mrs. Longenette, and he found there one Wilson, who may also have been inferred from the prosecution's questions to have been intimately acquainted with Mrs. Longenette. In an affray that took place in the Longenette home with no one present but the defendant and the

deceased the defendant killed Wilson. The state attempted to show by physical facts that the killing could not have occurred the way Corbin said it did and the state attempted to show by inference and innuendo that Corbin really killed Wilson because of his infatuation with Mrs. Longenette, who previously allegedy had been on intimate terms with Wilson. The Court, in its opinion, said: "The evident purpose of the state was to create from that inference, the further inference that at the time of the shooting, Corbin was actuated to kill Wilson in cold blood because of his resentment and jealousy. The record is entirely devoid of direct testimony of any improper conduct on the part of Mrs. Longenette with either the deceased or Corbin. . . . We are of the opinion that this testimony was irrelevant and harmful. . . . The law of evidence does not permit the building of one inference upon another inference." citing authority, including decisions of this Court.

This condemned strategy of building one inference upon another inference to establish a fact that could not be proved was utilized in several ways in the instant trial. For example, with reference to the telephone having been disconnected in the Hamric home some time prior to the shooting, the defendant was cross-examined at length, over objection, about that matter. That in itself might have been harmless but in his closing argument to the jury the prosecutor was permitted to make this statement with regard to that subject: "You remember the evidence. He talked about the telephone, said it wasn't important. Certainly it is important. Next door neighbors for seven years, I think she said she lives next door, but hasn't talked to him [deceased] for a long time, hasn't a telephone, whenever I said it was a physical object in the room, but she said it wasn't working, couple with young children, telephone not connected, woman looking out the back window through the venetian blinds which hang on the bathroom window, not on

four occasions, but I think on five or six; Glenn Winters and Marjorie Roub become engaged on the night of September 6 and the shooting occurred on September 7.'' There was no factual evidence in this record that the deceased and the defendant ever engaged in any extramarital sexual affair, that the defendant ever threatened the deceased, that she had been alone in his company at any time prior to the shooting, or that she had even ''talked to him for a long time'' prior to the shooting. The state knowing that it was unable to establish a motive by admissible evidence, in clear violation of the rule laid down in the *Corbin* case, by insinuation and innuendo, attempted to do that which is forbidden by the law of this state—establish a fact by building an inference upon an inference, and the cumulative effect of such evidence was clearly reversible error. The majority distinguished this case from the *Corbin* case upon the ground that such evidence was permitted to go to the jury in the Corbin case whereas in this case ''the objections to the questions . . . were sustained and the jury instructed not to consider them.'' That is not true with reference to the testimony of Marjorie Roub or the evidence relating to the telephone.

Although both the trial court and this Court found that no motive was necessary upon the facts of this case to sustain a verdict of second degree murder, this Court found that there was evidence from which the jury would have been justified in returning a verdict of murder in the first degree. The latter conclusion was based upon (a) an ''episode'' that occurred shortly after the killing, and (b) certain evidence from which this Court concluded ''that she did see whom she was shooting''. First, as to the episode: Audell Williams, mother of the defendant, was asked upon cross-examination if she did not tell Eunice Hardman, who lived across the street from the Hamric house, that ''the defendant had shot the deceased and an ambulance was at the scene.'' In the majority

opinion it is stated that this conversation between Mrs. Williams and Mrs. Hardman took place ''after the defendant went to her mother's house and talked with her mother. . . .'' That statement is also incorrect. This record clearly shows that at no time after the deceased was shot and prior to the conversation between Mrs. Williams and Mrs. Hardman was the defendant and her mother in the Williams home. The mother denied knowing anything about who called an ambulance but did not deny that she knew who had been shot, as did many other persons in the vicinity, before the conversation between these two women took place. The testimony of one of the principal witnesses for the state, Edison Parsons, establishes that fact. He said that when he arrived at the place where the deceased was, four minutes after receiving a telephone call from him saying that he had been shot, ''there was three flashlights over around there'', referring to the area in the rear of the Hamric house. He was asked these questions and made these answers: ''Q. Did you ever ascertain who that was with those three flashlights? A. Yes. Q. Who was it? A. Ted Randolph, Battrell, and Alva Hamric.'' State's witness Randolph said: ''I was in back of the house when the ambulance come down.'', and, of course, accompanied by officer Battrell and the husband of the defendant, Alva Hamric. Randolph further testified as follows: ''Q. Did you go over to the ambulance? A. I did. Q. Just when did you do that? A. Just right after the ambulance drove in. Q. You were in back of the Hamric house and you went directly over to where the ambulance was? A. That is right.'' He further stated that about five minutes thereafter he went to the Hamric house where other evidence shows Mrs. Williams and the defendant were standing. Mrs. Williams testified that she knew who had been shot because the officers told her. She stated that she saw the ambulance and, contrary to the statement contained in the majority opinion, testified as follows: ''Q. Will you state whether or not the police officers

[Randolph, Battrell, and Alva Hamric] went over to the ambulance? A. Yes, they did. Q. Could you see over at the ambulance or did you see them put anyone into the ambulance? A. No. Q. Did you know that it did drive away? A. Yes. Q. Did you later find out or ascertain who was put into the ambulance? A. Yes, I did. Q. From whom did you receive that information? A. From the town police.'' Now this is what, in rebuttal, Eunice Hardman said as to the conversation between her and Mrs. Williams: ''Q. Following that shotgun shot, do you recall seeing Audell Williams, the mother of Bonnie Hamric? A. *Quite sometime, not immediately after that.* (Italics supplied.) Q. When you saw her, where was she? A. She was coming back across the street from Bonnie Hamric's.'' Whatever was said between these women *the defendant was not present.*

As to the proposition that the defendant might have been able to see the deceased the state's witness, Corporal R. L. Casey, was asked these questions and made these answers: ''Q. What about the Venetian blinds? A. They were closed where you could see from the door, *you couldn't see out.* Q. If you would stand up close to the blind, that is, the *tilted* blind, could you then see out? A. Yes, sir.'' (Italics supplied.) Upon cross-examination as to that issue the witness was asked these questions and made these answers:

''Q. Could you actually see and identify persons or could you see movement and light?

''A. I could see movement and light; you could see where I was standing *with the curtain back.*

''Q. You mean where Mr. Whitehouse is standing?

''A. Mr. Whitehouse is not in this picture.

''Q. This is you?

''A. Yes, sir.

"Q. Then standing right up against the window like so and by glancing down, you can see out?

"A. Yes, sir, you can see out.

"Q. As you see right straight across, you can't see out?

"A. *You have to look down.*

"Q. And you can only do that from a very close distance?

"A. I stated from the door you can't see out there apparently.

"Q. And in no event could you see out looking directly, that is, *straight out horizontally at the Venetian blinds,* could you?

"A. *I wouldn't think so, no, sir.*"
(Italics supplied.)

Although hereinabove I have discussed the impossibility of the deceased being shot by the defendant if he were standing directly in front of the window of the den and beyond the hedge "in his own yard" in front of the wall of the Van Winkle house, that was done only because there was an assumption apparently by the trial court and the prosecution that the deceased was at that place when he was shot. The only evidence in this record as to where the deceased was when he was shot other than at the window came from the witness Edison Parsons and was in the form of a quotation from what the deceased was alleged to have told him [Parsons] shortly after his arrival at the place where he found the deceased shot. On redirect examination by the special prosecutor Parsons was asked this question and made this answer: "Q. Where did he show you he was when it happened? A. Corner of the carport there in his yard." It is not difficult to compute certain distances from the state's exhibit showing an aerial view of the area and by the state's evidence that it is twenty-seven and seven-

tenths feet from the Hamric house to the Van Winkle house. It is evident that the distance from the window of the den to the edge of the carport where the deceased said he was shot is at least thirty-four feet and we know from the state's evidence that the barrel of the gun inside the den was at least three feet from the drapes when the defendant fired the shot that killed the deceased. We know from the testimony of Corporal Casey, quoted above, that it was utterly impossible for the defendant to have seen the deceased behind a hedge "higher than a man's head in most places" thirty-four feet away from the window with the venetian blinds pulled together. Furthermore, the carport was not "approximately opposite" the window of the den as stated in the majority opinion. The state's exhibits show that a point on the wall of the Van Winkle house directly opposite that window is at least *twenty-five feet* from the corner of the carport.

The contention of the majority that this kind of evidence would have supported a verdict of murder in the first degree is not warranted by the law of this state. If the deceased had been at the corner of the carport as contended, in view of the trajectory of the charge, as heretofore discussed, the shots would have gone harmlessly into the ground many feet in front of the deceased even if the gun had been aimed in that direction, which it was not. There is no evidence of premeditation, no evidence of deliberation, and no evidence of malice in this case, and neither can be presumed by the use of a deadly weapon if the proper precedents of this Court are applied to the facts, that is, "a man's home is his castle", rather than the rule of "slight or no provocation". Suppose the defendant had known "whom she was shooting" and suppose he had been her ex-paramour, would that fact change the law relating to the invasion of a dwelling house by an intruder in the dead of night?

The following statements contained in the majority opinion are either inaccurate or do not state the law

applicable to the facts of this case: (1) On page six of the typewritten opinion is this statement: ''The hedge varied in height from around four to five feet or more.'' There is no evidence in this record to that effect. Corporal Casey first stated that the hedge was ''higher than a man's head in most places'' but upon being recalled said there were some places where it was no higher than his shoulder, he being five feet eleven inches in height. (2) On page thirteen, in referring to the affidavits of police officers Barber and Langley, and their finding of particles of glass and wood upon the deceased's shirt, is this statement: ''These particles were found under microscopic examination in the laboratory, and a notation of their presence was contained in the state police report.'' Both of these officers said that such particles could be observed and were observed by them *visually* and that it was not necessary to use a microscope to see them. (3) On page seventeen the majority states: ''Although she saw no one and made no outcry as she had done on the first occasion she grabbed the shotgun which was nearby and *fired through the window which was open,* making a small hole in the drapes and the bottom sash of the window.'' (Italics supplied.) All of the evidence of the state and the exhibits before us show that the window was either closed or raised no more than three or four inches at the time the shot was fired and that the charge pierced the glass and sash of the window as well as the venetian blind and the drape. One of counsel for the state in his closing argument to the jury, in a desperate attempt to distract the attention of the jurors from the evidence regarding the window, also made these untrue statements with regard to it. ''I said, Mr. Parsons, if you extend the line to which he was pointing, where would it go to, he said, toward the rear window out of which Bonnie was pointing the gun. Physical facts. And glass three feet away. Mr. Savage said I should have talked about it in my opening statement. I wasn't as smart as him; I am no expert with shotguns. You gentlemen know, you take a shotgun,

you stand with that muzzle two feet away, seven feet away from the window, you fire a shot through the window, you tell me that glass is only going to go three feet, if you actually believe she does that, no screen on the window, a 12-gauge shotgun, muzzle seven feet away, glass only three feet away, nothing from the other side as it went through the blind. The doctors told you there was no glass on his body, no cuts, no wounds, no arms up, you are full of little holes, could have been only as Dr. O'Dell told you, that under his arm had probably ricocheted. How come the glass was only three feet away, how did the big piece of glass get through into that room, how did it get there, you are shooting from the inside, the piece of glass is too big. If you break the glass out with the barrel, then let the drape fall, then—.'' At this point counsel for defendant objected, there was no ruling by the trial court, and counsel for the state continued his argument in a similar vein.

I cannot conclude this opinion without posing a query: The deceased was in a hospital in Charleston, forty miles from Ripley, from the seventh of September until his death on the 20th. After his second ''dying declaration'' on the 13th, the state's evidence shows that his condition improved for a few days. Why, during the thirteen days of the deceased's hospitalization, did no member of the staff of the office of the Prosecuting Attorney of Jackson County, Corporal Casey, Trooper Britton, or any other member of the department of public safety, the Sheriff of Jackson County or one of his deputies, or any other police officer, take a statement from the deceased or even go near his room? The inferences that any reasonable man may draw from that fact are ominous indeed.

It is, also, my understanding that a majority of the Court was of the opinion that bills of exceptions had been timely filed and that this case was considered upon its merits. Of course, a failure of a trial court to sign a bill of exception or a certificate in lieu thereof

within the statutory period, or an extension thereof by an order of the court, is fatal. Nevertheless this matter was discussed in the last three pages of the Court's opinion and this sentence contained therein troubles me somewhat: "However, notwithstanding this situation, we have carefully reviewed all of the assignments of error and do not find any of them constitute reversible error as indicated in this opinion." The final order, entered March 15, 1965, contained the following language clearly covering this matter and I quote the last sentence thereof: "And the defendant, having expressed her intention of appealing her conviction and sentence to the Supreme Court of Appeals of W. Va., and having moved the Court for a stay of execution of her sentence in order to perfect such appeal the Court doth order that a stay of execution be granted unto the defendant for a period of ninety days in order to perfect her appeal and to get her bills of exception signed by the Court, and further, upon motion of the defendant the Court doth further order that the said defendant be admitted to bail in the amount of ten thousand dollars." That order not only extends the stay of execution of the defendant's sentence but it also, in my opinion, clearly extends the period for ninety days within which "to get her bills of exception signed by the Court, . . . ."

For the reasons stated herein I would reverse the judgment of the Circuit Court of Jackson County and remand the case to that court for a new trial.